**UNITED STATES of America**
**v.**
**Edward John HOLLAND et al.**
**Crim. No. 73–418.**

United States District Court,
E. D. Pennsylvania.
June 26, 1974.

---

6. That proposed section contains entirely new material which does not appear in the 1938 Restatement.

Robert N. DeLuca, Asst. U. S. Atty., Philadelphia, Pa., for plaintiff.

David Rudovsky, Philadelphia, Pa., for defendant Ehly.

## OPINION

EDWARD R. BECKER, District Judge.

### I. *Preliminary Statement*

This is a motion by defendant Douglas Emil Ehly for arrest of judgment and for a new trial following his conviction on charges of bank robbery and forcing someone to accompany him in connection therewith without that person's consent. For the reasons that follow, the motion will be denied.

On May 10, 1973, Herbert Matlack was manager of the 47th & City Line Avenue (Philadelphia) branch of the Cayuga Federal Savings & Loan Association. That evening, while Mr. Matlack was at home with his family watching the Stanley Cup finals on television, there was a knock at the door. Two men appeared, flashing official-looking

credentials and representing themselves as federal agents investigating a robbery which had occurred at the Cayuga Federal a short time before. Mr. Matlack admitted the men to the house and they moved quickly to the kitchen. Thereupon one of the men brandished a revolver and announced their intended purpose: the robbery of the Cayuga Federal the following morning, in connection with which the Matlack family would be held hostage overnight and Mr. Matlack brought to the bank with the robbers to facilitate the robbery, while one of their number would remain with the family until the robbery was complete.

The events which followed are reminiscent of those recounted in the novel (and subsequent motion picture) "The Desperate Hours." [1] The Matlack family was indeed held as hostage overnight by the two men who entered by the front door and by two confederates whom the men later admitted through the cellar door. The gripping tale, hour by hour, of the events of the evening of May 10, and of the morning of May 11, until the robbery was complete and Mrs. Matlack and their two children released, was recounted in four separate jury trials under the above criminal docket number as well as in the course of pre-trial suppression motions. A brief procedural history is thus in order.

Defendant Francis Aloysius Murphy was referred to throughout the proceedings as the "number one man." According to the evidence at each trial, Murphy was the one who entered the front door first, and who remained in the living room until the Matlacks went to bed brandishing a gun and doing most of the

talking, *inter alia,* about how he had followed Mr. Matlack's routine for several weeks and about how the robbery was to be executed. After his apprehension, Murphy gave a statement to the F.B.I. confessing his role in the kidnapping and robbery. His motion to suppress the statement was denied and thereafter Murphy entered a guilty plea to all counts and has since been sentenced.[2] Defendant Clarence Ford was referred to throughout as the "number four man." According to the evidence at each trial, Ford was admitted through the basement, never appeared in the Matlacks' view on the evening of May 10, but was first seen on the morning of May 11 in the car which went to the bank. Upon motion, Ford's case was severed and he was convicted by a jury of all but the "kidnapping" count (18 U.S.C. § 2113 (e)) at a trial at which the principal evidence against him was his confession (suppression of which had also been denied after hearing) and Herbert Matlack's identification of him as a man who was in the car en route to the bank and in the bank during the robbery.[3]

The remaining two defendants were Edward Holland, who was referred to at each trial as the "number two man," (i. e., one who entered at the front door with Murphy), and Douglas Ehly, who was referred to throughout as the "number three man," (i. e., one admitted through the cellar door, but who was identified as having spent most of the evening in the living room with Murphy). Holland and Ehly were then brought to trial together. The evidence proceeded to its conclusion, closing arguments were made, and the jury was charged and sent to its deliberations.

1. *See* Time, Inc. v. Hill, 385 U.S. 374, 87 S. Ct. 534, 17 L.Ed.2d 456 (1967).

2. Murphy and the other three defendants were each charged with violation of the Bank Robbery Act, 18 U.S.C. § 2113(a), (b), (d), and (e), and conspiracy. Section 2113(e) prescribes a minimum 10 year sentence for whoever forces any person to accompany him without that person's consent in the furtherance of a bank robbery.

3. Ford denied being either in the house or the bank. However, in his statement and as a government witness in the second trial of defendant Edward Holland, he admitted being in the car. Mrs. Matlack had testified at Ford's trial to seeing the arm of a black man in the kitchen; Ford was the only black man implicated or indicted for the kidnapping and robbery.

During those deliberations the events occurred which gave rise to Ehly's double jeopardy claim: a juror, Alice Sarajian, became physically and mentally unable to continue deliberations, and, because of the circumstances detailed below, we declared, over Ehly's objection, a mistrial in the case against him. Defendant Holland elected to have the case against him proceed with eleven jurors; however, those jurors became hopelessly deadlocked; hence a mistrial was declared as to Holland as well. Ehly thereupon announced dissatisfaction with his counsel. We agreed to appoint new counsel for him, and, so as not to delay the retrial of defendant Holland, who had requested a speedy retrial, we severed the trials of Ehly and Holland and proceeded promptly to the retrial of Holland's case.[4] This time the government was aided by the testimony of Ford, who confessed his own role in the robbery and implicated Holland. Shortly before the case was to go to the jury, Holland entered a guilty plea to all but the § 2113(e) count, which the government agreed to dismiss at the time of sentencing.

■■ After newly appointed counsel had time to prepare, we proceeded to the fourth jury trial, at which Ehly was convicted on all counts of the indictment. The present motions arise therefrom, and consist of protective motions filed by Ehly and those filed by his exceptionally able counsel. Ehly's motion essentially tracks that filed by his counsel, except that it also raises the claim of insufficiency of evidence. That claim patently must fail in view of the positive in-court identifications of Ehly by Herbert Matlack, his wife Letitia, and his daughter Anne, all of whom had Ehly in plain view for long periods during the evening of May 10. Each of the identifications was unshaken by cross-examination. The government also presented evidence of an out-of-court identification of Ehly by Herbert Matlack and Anne Matlack, and evidence of a dental examination of Ehly which corroborated Anne Matlack's testimony about the location of Ehly's missing tooth.[5] While it is true that Herbert Matlack failed on one occasion to identify Ehly in a photospread, and Letitia made a photospread misidentification, we charged the jury in strict accordance with the requirements of United States v. Barber, 442 F.2d 517 (3d Cir.), cert. denied, 404 U.S. 846, 958, 92 S.Ct. 148, 30 L.Ed.2d 83 (1971), as to identification testimony. Ehly put on an alibi defense, producing two witnesses (his wife and one John Beauchemin) who claimed that he was in Rocky's Bar in Mays Landing, New Jersey at the time of the kidnapping, but the Government rebutted the defense by testimony of the bar owner, Rocky Castellani, and the jury apparently rejected it. After conviction and on post trial motions, the evidence must be viewed in the light most favorable to the Government. United States v. De Cavalcante, 440 F.2d 1264, 1273 (3d Cir. 1971). The evidence against defendant Ehly was strong, more than sufficient to sustain the verdict. We thus turn to the contentions raised by Ehly's counsel.

## II. *The Double Jeopardy Claim*

■ The double jeopardy claim stems from a mistrial ordered near the conclusion of the second jury trial under this bill of indictment, at which Holland and Ehly were jointly tried. That trial commenced with selection of the jury on Monday, December 3rd. The jurors commenced their deliberations at approximately 5:00 p. m. on December 11, the seventh day of the trial. After deliberating until 9:05 p. m., the jurors were sent home for the evening. They returned at 10:00 a. m. on December 12

---

4. All of the parties agreed to Ehly's motion for severance.

5. The procedure involved in the out-of-court identification and the dental examination are the subject of separate arguments on Ehly's motion and are discussed below.

to continue their deliberations. At mid-morning, during a coffee break, juror # 9, Alice Sarajian, approached Deputy Marshal Joseph Shaw, who was assigned to secure the jurors during their deliberations, and stated that she would like to talk privately with us. Marshal Shaw called the matter to our attention. In due course, so as to protect the anonymity of the juror, and after a lengthy colloquy with counsel (N.T. 8–3 to 8–14), we followed the procedure thus agreed upon, which was to: (1) summon the jury; (2) inform the jurors that we deemed it inappropriate to communicate with them individually under the circumstances; but (3) to tell them that, since it was about lunch time, the marshal would talk to them individually to obtain their luncheon orders, at which time any juror desiring to communicate with the Court could do so by writing a note and delivering it to the marshal. In due course we received Miss Sarajian's note, which read as follows:

Dear Judge Becker,

This is a burden I can't take. I am too emotionally upset. I cannot condemn anyone! I'm sorry. I'm a Christian and cannot judge a person —I have no right. Isn't there any way I can possibly be excused?

Alice L. Sarajian.[6]

Shortly thereafter we received word that Miss Sarajian had fainted in the ladies' room. We immediately summoned medical help in the person of William Gorham, M.D., who operates a clinic for the United States Postal Service in the Post Office and Courthouse Building. Dr.

Gorham ministered to Miss Sarajian and then, at our direction, came upstairs to the courtroom to testify.[7] We also instructed the Marshal to direct the jury not to resume deliberating until we instructed them otherwise.

According to Dr. Gorham, when he arrived he found Miss Sarajian attended by two of the other jurors in a state of retching. In terms of history, Dr. Gorham learned that Miss Sarajian was nineteen years of age, that she had been running to the bathroom most of the morning, that she had had no dinner the previous night and otherwise had eaten very little in recent days. She was pale and her pulse was rapid. He described her as being in a state of "acute hysteria" brought on by tension or stress; i. e., an inability to face problems present at the moment. Although Miss Sarajian was coherent, Dr. Gorham testified that he did not consider her capable of carrying on as a juror, and that if she went home and came in the next day the same thing would probably happen again in the deliberation room. The parties were all given an opportunity to cross-examine and state a position as to how to proceed.[8] However, we deferred final determination of the matter and, at 3:05 p. m., sent the remaining eleven jurors out to lunch, thus giving Dr. Gorham more time to attend Miss Sarajian. At 4:20 p.m., the jury returned from lunch. At that time, with agreement of the parties and with the appropriate admonition, we sent the jurors home, with instructions to return the following morning at 9:30 a. m. One juror remained to accompany Miss Sarajian home.[9]

6. In fact, we received two notes, the other from a juror who wanted to know whether a majority verdict would suffice.

7. In terms of qualifications, the testimony developed that Dr. Gorham is a graduate of Haverford College and the Medical School of the University of Pennsylvania. He took his residency at Jefferson Medical College Hospital. He is engaged in general practice and general surgery.

8. Ehly's position was:
I would rather be found guilty than let anything happen to that girl one way or the other, but if it will hurt her, I don't think it will benefit any of us by pushing her.
(N.T. 8–32).

9. After the jurors were dismissed for the day, they congregated in the jury room and composed a note indicating that they might

At 4:30 p. m., Dr. Gorham resumed the witness stand. By this time he had obtained some additional history; i. e., that Miss Sarajian had recently had two previous similar episodes when there was a conflict at her place of employment; that she had not been sleeping or eating properly since becoming a juror in this case (she had lost seven pounds); and that it was her own belief that if sent home to see her personal physician (whose name she refused to reveal) and for a good meal and a night's sleep, the same thing would happen to her over again. There was no cross-examination at this point. Nor was there any motion for a mistrial, although we observed that "if you have a juror that cannot pass judgment, then you have a hung jury sooner or later." [10]

Dr. Gorham also expressed the opinion that Miss Sarajian's emotional condition was so precarious that were the Court to ask her a few questions, "she's at a point where with her background, and so forth, she could be tipped over into a psychiatric or to a psychotic state."

As it happened, Albert Levitt, the chief psychologist for the Philadelphia Court of Common Pleas, had been in the United States Attorney's Office on that afternoon, and had been informed by the Assistant United States Attorney prosecuting the case of these developments. After hearing Dr. Gorham's testimony, Dr. Levitt took the witness stand to shed what light he could on the problem. He expressed the view that Miss Sarajian had an hysterical personality, and was a person who withdraws and does not want to accept the responsibility of decision-making. After we read her note to Dr. Levitt, he also described her as a type of personality who tends to think in negative terms because she thinks about herself in that manner and does not want anyone to criticize her, probably because of some underlying guilt feelings deep in her history. In terms of the effect of ordering Miss Sarajian to continue deliberations, Dr. Levitt responded:

[I]f you continue to stress her she is quite likely to develop more pathology. In other words, she's quite likely not just to faint next time, she is likely to develop some paranoid thinking, which is what I would suspect.

At this stage in the proceeding, the Government and defendant Holland stated that they would be willing to proceed with eleven jurors, although Ehly would not. However, everyone concerned (including the defendants), agreed that the next step should be for the Court to meet with Miss Sarajian in chambers with the only others present being Dr. Gorham and the court reporter, who would unobtrusively report the proceedings.

During the course of the meeting which followed, we expressed to Miss Sarajian our concern for her well being and our desire not to do anything which would impair her health, but we noted our responsibility to resolve the matter one way or the other. The following colloquy ensued:

THE COURT: Will you be able to go back and sit with the jury and deliberate? You heard my instructions, and I think you are an intelligent girl, and could come to a judgment. Will you be able to say, look, I've got certain personal feelings about this kind of thing, but the judge has instructed me that I have to, on the basis of the evidence and

___

be deadlocked anyway. However, we deferred commenting upon it and sent them home.

10. We also heard testimony at this juncture from Patricia Tierno, an employee of the United States Marshal's office who was acting as matron with Miss Sarajian. Miss Tierno testified that:

The only point she kept stressing to me was that she didn't want to come back and face the jury or you. She keeps stressing the point she can't condemn a person because she is a Christian. She said just like the doctor said that if she came back tomorrow the same thing would happen.

on the law as instructed, come to a verdict that I think is right and just and vote one way or the other.

. . .

JUROR NO. 9: I don't think I can do it. It is too much of a burden on me. I don't care who it is, who is on trial. I just can't judge a person. I am sorry. I should have told you that before. I apologize for all this. I can't make a judgment on anybody. I can't. If I am forced to—I don't know.

. . . . . .

It is not that I am saying the man is innocent or guilty. It is just my feeling.

DR. GORHAM: Are you afraid of having guilt having to render a decision one way or the other?

JUROR NO. 9: I just don't feel that I have the right to judge anybody. This is my belief. You can't change the way I feel. Who am I to judge a person, to convict him of something or to condemn him of something? There is a human being out there. I can't take that upon myself. I am a nobody. And I have no right.

Dr. Gorham continued to question Miss Sarajian extensively. The end result was the same:

THE COURT: If you had a meal, whatever it might be, and you had a good night's sleep and a good breakfast and come in in the morning you would be able to say, look, I am not compromising my religious scruples by performing my civil duty and trying my best to honestly and conscientiously come to a verdict on this case, whatever it may be?

JUROR NO. 9: I don't think I could do that.

THE COURT: All right. Is there any—or put differently, do you think you would end up in the same emotional state that you were in today?

JUROR NO. 9: Yes, I believe so.

Miss Sarajian nonetheless agreed to go home and return in the morning to advise us if anything had changed.

We thereupon returned to the courtroom and recounted the events of the conference in chambers to the defendants and all counsel. Dr. Gorham stated that, in the wake of the conference, his opinion remained the same. He and Dr. Levitt both agreed that Miss Sarajian's reactions were sincere. We instructed our court reporter to read the notes of the conference to the defendants and their counsel if they desired to hear them, and then recessed for the day.

The following morning Miss Sarajian appeared. We inquired:

The question is whether as a citizen you are capable of going back and deliberating with your fellow jurors and casting a vote or whether, on the other hand, to do so would again impose an intolerable burden and lead to an emotional attack of the kind that you faced yesterday. What do you think?

She replied:

No.

THE COURT: No, meaning?

JUROR NO. 9: No, meaning I can't go back and deliberate.

THE COURT: And do you feel if you did you would become ill again?

JUROR NO. 9: Yes.

At that juncture we made a number of findings of fact: (1) that Miss Sarajian had become emotionally ill during deliberations and was in an hysterical state; (2) that she suffered from personality inadequacies which, when coupled with stress such as that to which she was subjected as a juror, made her unable to function; (3) that if forced to return to the jury room she would be unable to deliberate; (4) that if forced to return she would become ill again and that she might develop a psychiatric illness as well; and (5) that her religious scruples were a contributing factor which made it impossible for her to judge anyone. Defendant Holland

agreed to proceed with eleven jurors. Defendant Ehly was unwilling to do so and insisted (at variance with his earlier statement, see n. 8 *supra*) that Miss Sarajian be sent back to deliberate. Noting that we had explored all other possible alternatives to the declaration of a mistrial, and that the interests of proper judicial administration required us to consider the health of human beings on the jury, we declared there to be manifest necessity for a mistrial. It was our belief at the time of the mistrial declaration, and it is our belief now, that to have forced Miss Sarajian back to the jury deliberation room would have been little short of barbaric. In retrospect, it seems to us that we had done all we could to preserve the investment of nine days' trial time and the defendant's right to proceed to verdict with the jury that had been chosen, by deferring decision in the hope that events might change course. However, the string ran out, as it were.

■ The Fifth Amendment prohibition against double jeopardy bars reprosecution of a defendant where a trial judge declares a mistrial over the defendant's objections, unless there is a showing of "manifest necessity" for such an act. United States v. Perez, 9 Wheat. (22 U.S.) 579, 580, 6 L.Ed. 165 (1824). Defendant Ehly cautions us that under the "manifest necessity" rule, the power to declare a mistrial "ought to be used with the greatest caution under urgent circumstances," United States v. Perez, supra at 580, and that in United States v. Jorn, 400 U.S. 470, 485, 91 S. Ct. 547, 557, 27 L.Ed.2d 543 (1971), "manifest necessity" was interpreted as "a command to trial judges not to foreclose the defendant's option until a scru-

pulous exercise of judicial discretion leads to the conclusion that the ends of public justice would not be served by a continuation of the proceedings."

We can find no case even close on the facts. But an exegesis of the law of double jeopardy seems unnecessary. We believe that we exercised great caution under the circumstances. We delayed the deliberation of the jury for about a day so that we could attempt to resolve the matter, and we summoned the best medical help immediately available. Dr. Gorham and Dr. Levitt impressed us as being professionals of ability and perception. It is true that neither was a psychiatrist, but courts do not have the funds to have psychiatrists immediately available for such occasions. We believe that the circumstances were urgent. If the law is humane, and these circumstances were not urgent, what circumstances are? Having pondered the matter with care, we were satisfied that the ends of justice (which require the services of jurors) would be disserved by a continuation of the proceedings. We still are. Hence, we reject defendant's double jeopardy claim.[11]

## III. *The Remarks of the Prosecutor*

During the course of his rebuttal argument, the Assistant United States Attorney asserted:

> But, ladies and gentlemen, when the defense chooses to put on evidence the rules of the game change a little bit because then you can examine what was put on and what may not have been put on. Once a defense witness takes the stand, once evidence is offered, then the shield isn't there that the system provides.

11. The case of United States ex rel. Russo v. Superior Court of New Jersey, 483 F.2d 7 (3d Cir. 1973), cited by defendant, is inapposite. In that case the Court of Appeals held that there was no manifest necessity to declare a mistrial, on the ground that the jury was too exhausted to reach an impartial verdict, where the jury had deliberated for only 15 hours, deliberations had been interrupted by a night's rest at a motel, the jury never indicated that it was exhausted, the trial judge did not ask the jury about its physical condition nor question the jury as to its progress toward reaching a verdict, testimony requested by the jury following eleven hours of deliberation demonstrated that it was focusing on a crucial issue, and the jury had been told that it could have all the time it needed.

Defense counsel objected but we deferred ruling until we could see where the prosecutor's remarks were heading. In his succeeding remarks he added, *inter alia*:

Let's talk about the teeth for awhile. He says that the dentist, Dr. Mendez, who examined Mr. Ehly, didn't mention discoloration. He did mention tartar accumulation. In your common experience what does tartar look like? Is it snowy white? Why do you go to get your teeth cleaned? You get your teeth cleaned to take the tartar off. Tartar is dirty, right? Sure. Now you will notice that it served the purposes of the defense to have Mr. Ehly stand here and Mr. Matlack stand here to show you heights. It served the purpose of the defense to do that. Did it serve the purpose of the defense to have Mr. Ehly come up to the jury box and do this?

Thereupon defense counsel objected. We sustained his objection but denied his next motion, which was for a mistrial.

In his motion for arrest of judgment and for a new trial, defendant asserts that his right to be free from self-incrimination was violated by "the prosecutor's comment on the fact that he had not testified in his own behalf." In support of that contention, defendant argues that the prosecutor's comments about defendant not showing his teeth to the jury and about "losing his shield" were impermissible. He argues that the statement amounts to comment on failure to testify or, in the alternative, failure to present evidence. We find these arguments to be without merit because of the cautionary instructions which we promptly gave the jury with respect to these matters, and for other reasons.

Upon the conclusion of the foregoing segment of the prosecutor's remarks, we instructed the jury that, while counsel are entitled to argue from the law, the jury must take the law from the Court. We then informed the jury that the burden of proof remains on the prosecution throughout the trial and that the defense has no burden to introduce any evidence or to prove any fact which would, if believed, create a reasonable doubt. We noted that, insofar as the Government was saying that the jury is entitled to examine the reliability and consistency of the evidence offered by the defense in an effort to create reasonable doubt, it was making a proper argument. But we repeated and underscored that the defendant had no obligation to take the stand and that the jury could draw no adverse inference from the failure of the defendant to testify. The prosecutor resumed his argument but thereafter abandoned the line of argument which gave rise to objection.

An hour or so later we charged the jury. In the course of our charge we reiterated:

Now, I instruct you, members of the jury, that the guilt of the accused is not to be inferred because the facts proved are consistent with his guilt. If you believe that two conclusions can reasonably be drawn from the evidence as you find it, one of innocence and one of guilt, then you should find the defendant not guilty on that count. The Government must prove beyond a reasonable doubt all of the essential elements of the crime charged before a verdict of guilty can be returned. And if the Government does not discharge its duty or burden with respect to a particular crime or crimes charged in their essential ingredients, then it will be your duty to find the defendant not guilty with respect to such crime or crimes.

. . . . . .

Now, I again instruct you that the defendant has no burden to prove his innocence, or, indeed, to introduce any evidence or to convince you of any fact which, if true, would be a defense to the crime or crimes charged in the indictment. The defendant is presumed innocent, and that presumption continues throughout the trial and during the deliberation of the jury and is overcome when, and only when, his

guilt is established beyond a reasonable doubt.

I again instruct you that the law does not compel a defendant in a criminal case to take the witness stand and testify and no presumption of guilt may be raised and no inference of any kind may be drawn from the failure of Mr. Ehly to testify. The fact that he did not take the stand in this case must not enter into your deliberations.

We believe that any misstatement by the prosecutor was cured by the immediate cautionary instruction and by the charge which followed in short course. But we also believe that the defendant misapprehends the import of the prosecutor's statement. As we see it, what he principally was saying was that once the defense put on evidence, the jury was free to evaluate it, and that the prosecutor was free to comment upon any deficiencies in the defendant's evidence so long as his comment was not directed to the defendant's failure to testify. This was a proper argument. In United States v. McClain, 469 F.2d 68 (3d Cir. 1972), the appellant argued that his Fifth Amendment right to remain silent was violated by the following comment by the prosecutor in his closing argument:

> Now, we know this, it is uncontradicted from our evidence if you believe it, from the government's evidence, that only four people were in that bank, and four people sit accused of this crime. There were no witnesses brought in by the defense who would say that these men were somewhere else at the time of this robbery, so you have that to go with. There is no contradiction of the government's case.

The court found no merit in this contention, stating:

> The comment of the prosecutor was not directed at the failure of the accused to testify; nor could the jury have reasonably construed it as such. Examined in its entirety, the comment

merely drew the jury's attention to defendant's failure to present alibi witnesses. This was fair argument and not violative of the principle announced in Griffin v. California, 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965).

469 F.2d at 70 (footnotes omitted). We think this case is controlled by *McClain*.

With respect to the comment about Ehly's failure to exhibit his teeth, it should be noted that the defendant himself requested, and was permitted, to exhibit himself to the jury so that his height and build might be compared with that of Mr. Matlack. The Government argues that Ehly thus opened the matter of his physical features up, and there is merit in this argument. Moreover, the location of Ehly's missing tooth is non-testimonial in character. See discussion *infra*. We note finally that in the scope of the overall proceedings the remark was isolated and unimportant and at most was harmless error.

IV. *The Dental Examination*

Upon motion of the government we permitted a dental examination of the defendant to determine whether or not he was missing a tooth in the area of his mouth pinpointed by Anne Matlack to the F.B.I. Defendant claims that the examination violated his Fourth and Fifth Amendment rights. That claim is plainly without merit. With respect to the Fifth Amendment claim, the examination was not testimonial or communicative in nature. *See* United States v. Wade, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967) (lineup identification); United States v. Dionisio, 410 U.S. 1, 93 S.Ct. 764, 35 L.Ed. 2d 67 (1973) (voice exemplars); United States v. Mara, 410 U.S. 19, 93 S.Ct. 774, 35 L.Ed.2d 99 (1973) (handwriting exemplars); Schmerber v. California, 384 U.S. 757, 761, 86 S.Ct. 1826, 16 L. Ed.2d 908 (1966) (blood samples). As the Court stated in *Dionisio*, "It has long been held that the compelled display of identifiable physical characteristics

infringes no interest protected by the privilege against compulsory self-incrimination."

As for the Fourth Amendment claim, the Supreme Court held in *Dionisio* that the Fourth Amendment does not protect "what a person knowingly exposes to the public even in his home or office. . . . Like a man's facial characteristics, or handwriting, his voice is repeatedly produced for others to hear. No person can have a reasonable expectation that others will not know the sound of his voice, any more than he can reasonably expect that his face will be a mystery to the world." [12] This doctrine is applicable as well to a missing tooth. Cast in the famous language of Katz v. United States, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), reiterated in *Dionisio,* our holding is that the defendant could not harbor a reasonable expectation of privacy with respect to his missing tooth. We believe that the dental examination, though it did involve examination of the defendant's mouth by a dentist, is much closer to the *Dionisio-Mara-Wade* situation than the *Schmerber* intrusion of inserting a needle into a vein to remove a sample of blood. Here our order required merely that the defendant open his mouth for long enough for a dentist to observe which tooth was missing. We find this to be no more of a Fourth Amendment intrusion than the procedures approved in *Dionisio, Mara,* and *Wade*; nor do we feel the dental examination constituted a "search" of the defendant's mouth.

V. *Permitting the Jury to Separate During Their Deliberations*

The jury deliberations at the fourth trial commenced on Thursday, March 21 at approximately 3:30 p. m. The jury deliberated until about 8:45 p.

m., at which time we announced that we would send the jurors home for the night. Defendant objected to permitting the jury to separate. With the exception of one juror who came from some distance and expressed a desire to be put up in a local hotel, the jurors had expressed a desire to go home for the night. We overruled defendant's objection and permitted them to go home. They resumed their deliberations the following morning at 9:00 a. m. and arrived at their verdict that evening at 8:30 p. m. The defendant contends that we erred in not sequestering the jury in a hotel on the first evening of their deliberations.

It is, and apparently always has been, the practice in this district to permit jurors in criminal cases to separate overnight during their deliberations. Only in the rarest of *causes célébres* is the jury sequestered. While the rule in the Seventh Circuit may well require sequestration of all deliberating juries,[13] there is no authority in this Circuit for so requiring. Several other circuits leave sequestration to the discretion of the judge.[14]

The purpose of the Seventh Circuit's rigid rule, as stated in *Panczko,* is to prevent the possibility of exposure of the jurors to any outside influence of any sort during deliberations, and to assure the convenience, comfort, and safety of the jurors. We recognize the importance of these goals. We believe, however, that these aims are best attained by vesting the trial judge with discretion to consider all the circumstances and to decide whether sequestration is necessary in a given case or whether less stringent measures will suffice. Accordingly, we did not adhere to the prophylactic rule espoused in *Panczko* and *D'Antonio* but chose instead to weigh the factors bearing on the exercise of our discretion.

12. 410 U.S. at 14.

13. United States v. Panczko, 353 F.2d 676 (7th Cir. 1965), cert. denied, 383 U.S. 935, 86 S.Ct. 1066, 15 L.Ed.2d 853 (1966), and United States v. D'Antonio, 342 F.2d 667 (7th Cir. 1965).

14. *E. g.,* United States v. Harris, 458 F.2d 670 (5th Cir.), cert. denied, 409 U.S. 888, 93 S.Ct. 195, 34 L.Ed.2d 145 (1972), and cases cited p. 674; Sullivan v. United States, 414 F.2d 714, 715 (9th Cir. 1969); Hines v. United States, 365 F.2d 649 (10th Cir. 1966).

The jurors in the present case were carefully and repeatedly instructed in stentorian tones that they were to have no communications with anyone outside of the courtroom, even loved ones at home, about the case. The instruction also forbade discussions among jurors outside the courtroom or jury deliberation room. These instructions were reemphasized when the jurors were permitted to separate overnight during their deliberations. There was no showing that any juror violated the Court's instructions, nor any suggestion of outside influences upon them. To have sequestered these jurors would have exacerbated the hardship of their jury service and we saw no need for it. We thus find the defendant's claim to be without foundation.

VI. *The Manner of Presenting Evidence of Out-of-Court Photographic Identification*

 Defendant Ehly has objected to testimony of out-of-court photographic identifications by Herbert Matlack and Anne Matlack on the ground that we erred in admitting, over objection, the testimony of two F.B.I. agents that the photographs shown to them were in fact of Mr. Ehly. Ehly alleges that this testimony was hearsay because the photographs were not taken by the agents themselves and the statements by the two agents that these were Ehly's photographs were based on what the agents were told by others. Ehly claims further that the prosecution failed to establish the chain of custody of the photographs, thus presenting a clear possibility of multiple hearsay. We disagree.

Although the questioned practice has been followed regularly in this court for many years, the question is an interesting one, on which no precedent has been cited to us. The introduction by the Government in its case-in-chief of evidence of pretrial photographic identifications is a practice firmly countenanced by our Court of Appeals. In United States v. Hines, 470 F.2d 225, 228 (3d Cir. 1972), the Court recognized that reference to out-of-court identifications to buttress in-court identifications " 'has been a proper and strategically sound tactic for years,' " quoting from United States v. Clemons, 144 U.S.App. D.C. 235, 445 F.2d 711, cert. denied, 404 U.S. 956, 92 S.Ct. 322, 30 L.Ed.2d 273 (1971). The Court also cited with approval the Supreme Court's recognition of the strong probative value of pretrial identifications, *see* Gilbert v. California, 388 U.S. 263, 272 n. 3, 87 S.Ct. 1951, 18 L.Ed.2d 1178 (1967).[15] Defendant does not challenge the admissibility of the

15. In *Hines*, the Court said:

". . . [T]he earlier identification has greater probative value than an identification made in the courtroom after the suggestions of others and the circumstances of the trial may have intervened to create a fancied recognition in the witness' mind."

Evidence of pre-trial identifications is even more important where, as here, the trial takes place seventeen months after the crime was committed, since such a time lapse would invariably strengthen the possibility of a mistaken identification in the minds of the jurors. Indeed, in United States v. Hallman, 142 U.S.App.D.C. 93, 439 F.2d 603, 604 (1971), the court stated that evidence of a pre-trial identification was "more meaningful to the jury than the more ritualized in-court identification." Given the great need to substantiate the witnesses' in-court identifications here[9] we

9. No other evidence to corroborate identity was found in this case, such as fingerprints, clothing worn in the robbery, or stolen money.

agree with the court in *Hallman* that "[t]he importance that a jury know of the reality of a fair pre-trial identification weighs with more substance in the scales of justice than [the] speculative possibility that the jury may conjecture [that the] defendant was involved in some other offense." *Hallman* at 605.

470 F.2d at 228–229. The need in the case at bar for the probative content of the pretrial identifications was similarly important, for the only issue in the case was identification, and the only evidence the Government was able to introduce on that issue was the in-court and out-of-court identifications by the Matlacks. There were no fingerprints, no bank security camera photographs, no unusual spending patterns by the defendant, no unexplained absence from work during the time of the robbery, etc.

prior identification of his photographs as such,[16] but rather the hearsay element inherent in the process of proof. More specifically, Mr. Matlack and F.B.I. Agent Richard Schwein testified that on September 11, 1973, Mr. Matlack identified a photograph as that of a perpetrator of the crime, and to link up this testimony to a relevant issue in the case, namely the question whether the perpetrator of the crime was the defendant Douglas Ehly, we allowed Agent Schwein to testify that the photograph selected by Mr. Matlack was a photograph of Douglas Ehly. Similarly, both Anne Matlack and F.B.I. Agent Michael Boyle testified that at a photospread on July 25, 1973, she selected a photograph; we allowed Agent Boyle to testify that it was a photograph of Ehly. Ehly however disputes that Schwein and Boyle were competent to identify the photographs because (a) they had no personal knowledge that the photographs were Ehly's, and (b) the basis for their testimony was hearsay, that is, they were told that the photographs were Ehly's, either by other law enforcement officers or by the writing on the photographs which stated Ehly's name.

In the ordinary case, the only way the Government could have deterred the defendant from making a hearsay objection would have been to put on the stand either the police technician who made the photographs (who would have the necessary personal knowledge) or the custodian of the photographs (who could identify the photographs as business records, bringing them within the business record exception to the hearsay rule). Either method would clearly suggest to the jury that the defendant had been in trouble with the law, in violation of the principle of United States v. Stirone, 262 F.2d 571 (3d Cir. 1959), rev'd on other grounds, 361 U.S. 212, 80 S.Ct. 270, 4 L.Ed. 252 (1960), that evidence of other offenses is generally inadmissible in a criminal prosecution. As a corollary of that principle, great pains must be taken to avoid making the jury aware that the photographs used for pretrial identifications are "mugshots."[17] We did so here.[18] In essence, therefore, the defendant, by his argument, was trying to exclude the two pretrial identifications altogether by catching the Government in a pincers between the hearsay rule and the mugshot rule. We do not agree with such a result, either in general or under the facts of this case where the defendant sought to invoke the hearsay rule after having himself shown to the jury the mugshot identified by Anne Matlack to take advantage of Mrs. Matlack's misidentification and Mr. Matlack's prior failure to identify at the July 25 photospread session.

Our overriding concern in conducting a trial is seeing that the jury is presented with all available evidence that is probative but not unduly prejudicial. The hearsay rule goes to the probative value of evidence; the mugshot rule to prejudice. We have already explained (see note 18) how the prejudice was minimized by the manner in which the photographs were referred to and

---

16. At the trial he objected on the basis that the jury might infer that he had been in trouble with the law before (the *Hines* issue). He does not renew that claim on these motions, but presses only the hearsay point.

17. In *Hines*, the jury had not been told that the photograph was a mugshot, nor did they see the photograph. The Court seemed to rely heavily on that fact in discounting the prejudicial effects of the use of the photograph.

18. Upon our inquiry, defense counsel asked us to caution the jury not to assume that the photographs were mugshots, and we instructed them as follows:

> There has been a reference in the testimony, indeed you have seen in evidence a photograph of Mr. Ehly which was in the possession of the FBI. Now on that subject I instruct you that the police have many pictures of many people. I instruct you that simply because the police, or in this case the FBI, have a person's picture does not mean that he has ever committed a crime before or since. So please understand that there is no connotation of guilt of any kind simply because a photograph of Mr. Ehly was in the possession of the FBI.

the cautionary instruction to the jury.[19] We shall next see that the probative value was strong despite the partial hearsay nature of the identification of the photographs as being the defendant's.

■ In the first place, the agents' testimony was not, as defendant asserts, based entirely on hearsay. At the time of the trial, Agents Schwein and Boyle of course were familiar with Ehly. They therefore were competent to express the opinion[20] that the photographs were Ehly's, independent of the source of, or identifying marks on, the photographs. Similarly, since the jury saw one of the photographs, it could judge for itself whose picture it was, having had ample opportunity to observe the defendant in person during the trial.[21] In an additional effort to ensure the trustworthiness of the testimony in question, the Government showed, out of the presence of the jury, that the photographs were in fact law enforcement agencies' photographs bearing the defendant's name. While this is of course hearsay, we believe that the focus of the hearsay rule and its exceptions is the trustworthiness, the reliability of the out-of-court declaration. Thus we were more interested in the truth or falsity of the declaration that these were Ehly's pictures than in the mechanical application of a rule of evidence. All the other indications that the pictures were Ehly's were certainly sufficient to bring the declaration within the Supreme Court's proposed catchall hearsay exception, *see* proposed Federal Rules of Evidence, rule 803(24): "A statement not specifically covered by any of the foregoing exceptions but having comparable circumstantial guarantees of trustworthiness" is not excluded by the hearsay rule.[22] However, we do not rest our decision upon the proposed rule. The Third Circuit has itself, in *Hines*, indicated its own disinclination, in the context of the mugshot rule, to adopt " 'a mechanical jurisprudence, with evidence admitted if it can be fit within a recognized exception' or excluded if it cannot be regardless of its prejudicial nature or probative value." 470 F.2d at 228, quoting from C. Wright, Federal Practice and Procedure § 410, at 132 (1969). The Court in that case preferred a balancing technique, where the degree of prejudice is measured against the probative value of the offered evidence. To hold to the contrary and to apply a mechanical hearsay doctrine would totally emasculate the principles of *Clemons* and *Gilbert*, as reiterated in *Hines*, and virtually immunize a defendant from the effect of pretrial photospread identifications.

This case was an even stronger one for letting the evidence in than *Hines*, because we were not dealing with prejudicial effects at all, but rather only with a hearsay challenge to the probative value of the evidence. The agents were available for cross-examination as to the accuracy of their statements that the photographs were photographs of Ehly.

19. Indeed, we probably would not have allowed the jury to see the photograph here unless the defendant wanted to show it to them for tactical reasons unrelated to the mugshot problem. We did not show the second photograph, the one used in the September 11 spread, to the jury.

20. Some opinion testimony, such as estimates of distances, sizes, weights, ordinarily comes from nonexpert witnesses. In fact, all identification testimony is, in a strict sense, opinion evidence, since it is based on the witness's comparison of what he knows about an individual with what he perceives about the person he identifies as that individual.

21. We also examined the photographs ourselves and had not the slightest doubt, having seen Mr. Ehly so many times during the course of the proceedings, that they were his.

22. We are mindful that this provision was eliminated by the Congressional committee considering the bill to approve the proposed rules. However, under Criminal Rule 26, even without the Federal Rules of Evidence, our rules of evidence are "the principles of the common law as they may be interpreted by the courts of the United States in the light of reason and experience." Until this rule is abrogated by passage of the Federal Rules of Evidence, we feel that some flexibility and discretion are available to us.

Such cross examination could have been heard as on voir dire, out of the hearing of the jury. This fact further saps the strength of the hearsay objection. Moreover we also note that the defendant does not claim that the photographs selected by Anne and Herbert Matlack were *not* his photographs.[23] Rather, the nature of his objection is a purely technical one, going to the technical admissibility of certain evidence of essentially uncontested accuracy.

Accordingly, weighing the strong probative value of the pretrial identification as recognized in *Hines,* and the importance of the identification issue, which was the only issue in the case, and the substantial trustworthiness of the identity of the photographs' subject, we admitted the evidence despite its partial basis in hearsay. Upon careful consideration, we reaffirm that ruling.

### CONCLUSION

Finding merit in none of the defendant's contentions, we will deny his motion for arrest of judgment or a new trial.

---

23. In fact, as we pointed out above, he had to agree that the photograph shown to Anne Matlack was his, so as to take advantage of the misidentification of the same photograph by Letitia Matlack and the failure of Herbert Matlack to identify it.