Thomas Russell Jones, J.
Fifteen-year-old Keno White has petitioned the Supreme Court, pursuant to CPLR article 78, to prohibit the Judges of the Family Court from reopening a fact-finding hearing by which he may be adjudged a juvenile delinquent, on the grounds that he will thereby be subjected to double jeopardy in violation of the Fifth and Fourteenth Amendments to the United States Constitution, and contrary to section 6 of article I of the New York State Constitution.[1]
The petitioner contends that he had already been exposed to jeopardy of his liberty in the Family Court on July 21, 1975 when a witness was sworn and testified against him in an adjudicatory hearing, based upon a petition which charged him with criminal assault. In the midst of that proceeding the court declared a mistrial, over the objections of the Law Guardian for the petitioner. In fact, the Presiding Judge ordered the mistrial, sua sponte, and for his own convenience. The Judge remarked as he did so: "I am disqualifying myself and declaring a mistrial * * * I’m sitting here only to the end of next week, and then I move on to other parts of the City”. Next day, July 22, 1975, the Presiding Judge, on his own initiative, recalled the case and abrogated the mistrial order for the purpose of reinstating the adjudicatory hearing against the accused. The Law Guardian again objected and raised the constitutional issue of double jeopardy as a bar.
The petition for a writ of prohibition is granted (Matter of *571 Lee v County Ct. of Erie County, 27 NY2d 432, 437; cf. also Matter of Ferlito v Judges of County Ct., Suffolk County, 39 AD2d 17, 18, affd 31 NY2d 416; Matter of Kraemer v County Ct. of Suffolk County, 6 NY2d 363; Matter of Nolan v Court of General Sessions, 15 AD2d 78, affd 11 NY2d 114). Jeopardy attached against the petitioner on July 21, 1975 when a witness was sworn and testified in the fact-finding hearing. The object of that proceeding was to determine whether the accused had committed an assault upon another person which violated the criminal law.[2] The result of the hearing might have been to deprive the respondent of his liberty for as long as three years.[3] The Presiding Judge should not have declared a mistrial, in view of the Law Guardian’s objections, since there was no "manifest necessity” for doing so, nor would the "ends of public justice have been defeated” had he not done so (cf. United States v Perez, 9 Wheat [22 US] 579). On May 27, 1975 the United States Supreme Court declared that juvenile defendants are entitled to the protections of the Fifth Amendment to the United States Constitution in Breed v Jones (421 US 519). In crystal-clear language the court announced that juveniles enjoy the full panoply of constitutional rights which guard the liberties of adults accused of crime, in Family Court adjudicatory proceedings, except the right to a trial by jury (cf. McKiever v Pennsylvania, 403 US 528;[4] United States ex rel. Murray v Owens, 465 F2d 289, cert den 409 US 1117). The Supreme Court has now issued precise injunctions to State juvenile courts commanding them, inter alia, to accord young defendants accused of crime the same Fifth Amendment safe *572 guards against double jeopardy as adults. The court was prompted to speak specifically to the double jeopardy question because it was confronted with: "a conflict between Courts of Appeals and the highest courts of a number of States on the issue presented * * * and similar issues and because of the importance of final resolution of the issue to the administration of the juvenile court system” (421 US 519, 527). The mandate of the Breed decision applies to this case, for the reason that the Fifth Amendment right against double jeopardy attaches to State action under the Fourteenth Amendment (cf. Benton v Maryland, 395 US 784). In every fact-finding hearing, when a respondent is (p 531): " 'put to trial before the trier of the facts,’ * * * that is, when the Juvenile Court, as the trier of the facts, [begins] to hear evidence. See Serfass v. United States, 420 U.S., at 388.”[5]
The State of New York may not deprive its delinquent children of their constitutional rights under the ancient doctrine of parens patriae, when it charges them with crimes.[6] As Associate Justice Fortas, speaking for the Supreme Court in Kent v United States (383 US 541, 556), mournfully observed: "There is evidence, in fact * * * that the child receives the worst of both worlds: * * * he gets neither the protections accorded to adults nor the solicitous care and regenerative treatment postulated for children.” The President’s Commission on Law Enforcement and Administration of Justice, Task Force Report on Juvenile Delinquency and Crime, published in 1967, confirmed the Supreme Court’s findings in Kent, and said (p 7): "[T]he great hopes originally held for the juvenile court have not been fulfilled. It has not succeeded significantly in rehabilitating delinquent youth, in reducing or even stemming the tide of juvenile criminality, or in bringing justice and compassion to the juvenile offender.” The Supreme Court was compelled to speak out again in defense of the constitu *573 tional rights of children in an historic opinion, Matter of Gault (387 US 1, 14-17), when it declared that the states’ parens patriae claims in relation to children in trouble had become a sham. Juvenile courts were criticized for failing to attempt the reconstruction of the lives of juvenile delinquents by tender care and humane measures. Instead, the court found that Judges and other State officials maintained the young offender in prisons where (p 27): "His world becomes 'a building with whitewashed walls, regimented routine and institutional hours * * *.’ Instead of mother and father and sisters and brothers and friends and classmates, his world is peopled by guards, custodians, state employees, and 'delinquents’ confined with him for anything from waywardness to rape and homicide.”
When a number of State juvenile courts persisted in ignoring the spirit of Gault and relentlessly subjected delinquent children to the "worst of both possible worlds,” the Supreme Court ended the charade by which Judges pretended to act as parens patriae, in the Breed decision (421 US 519, supra).
There was no legal justification, i.e., no "manifest necessity” for the declaration of a mistrial in the midst of the Family Court adjudicatory hearing (cf. United States v Wilson, 420 US 332, 344). When the juvenile’s Law Guardian moved for a continuance in order to obtain a transcript of the previous testimony of a witness for the purposes of cross-examination, the court should have acquiesced. Instead, the Judge declared a mistrial because he had been assigned to work in another county! He claimed that he could not or would not return to Kings County to complete the pending case. The rotation of Family Court Judges from county to county and from one jurisdiction to another for administrative purposes cannot justify the declaration of a mistrial for the convenience of the court system.[7]
For 150 years it has been the law that a mistrial may be ordered in a case only when the Presiding Judge has deter *574 mined that "there is a manifest necessity for the act, or the ends of public justice would otherwise be defeated.” (United States v Perez; 9 Wheat [22 US] 579, 580, supra.) The court’s decision to do so must be supported by circumstances that are imperative and substantial (cf. Matter of Nolan v Court of General Sessions, 11 NY2d 114, 118; Matter of Snee v County Ct. of County of Cayuga, 31 AD2d 303, 307; Matter of Art v City Ct. of City of Rochester, 35 AD2d 1062; United States v Holland, 378 F Supp 144, 152, affd sub nom. Ehly v United States, 506 F2d 1050, cert den 420 US 994). Among several imperatives which appellate courts have considered appropriate bases for mistrials, without a defendant’s consent, are, viz., when the court found that it was "physically impossible to proceed with the trial in conformity with law” or on "gross misconduct by the defendant” (CPL 280.10, subds 2, 3); in the event of "death or serious illness of the judge or other essential court personnel” (People ex rel Epting v De Voe, 309 NY 818; in a case of the "serious illness of a prosecution witness” (People v Kelly, 9 NY2d 697), and when bribery or corruption of a juror was discovered. (Cf. cases in other jurisdictions analyzed in 22 CJS, Criminal Law, §§ 258-259.)
The reassignment of a Family Court Judge to another county for administrative reasons in this case was manifestly not a "manifest necessity” contemplated by statute or case law. Nor was this a situation in which the court found it "physically impossible to proceed with the trial” or to prevent the defeat of the ends of public justice (cf. Matter of Ferlito v Judges of County Ct., Suffolk County, 39 AD2d 17, affd 31 NY2d 416, supra). In the Matter of Girard v Rossi, 40 AD2d 13, 14-15, the Appellate Division, Fourth Department, said, Per Curiam: "When the Trial Judge aborts the trial without the defendant’s consent the defendant has been deprived of his Valued right to have his trial completed by a particular tribunal’ (Wade v. Hunter, 336 U.S. 684, 689) and the trial court should consider 'the importance to the defendant of being able, once and for all, to conclude his confrontation with society through the verdict of a tribunal he might believe to be favorably disposed to his fate.’ (United States v. Jorn [400 US 470,] 486).” The Appellate Division, First Department, invoked the Fifth Amendment in People v Goldfarb (152 App Div 870, 874, affd 213 NY 664) warning that: "unless the trial is terminated by disagreement of the jury, or their discharge pursuant to law, or by consent of the accused, or through *575 extreme or absolute necessity, as by illness or death [the accused] has been put in jeopardy and cannot be prosecuted again in the same or another court on the same charge; and the discontinuance of the prosecution is equivalent to a discharge, for the constitutional protection grants the defendant immunity against a second trial.” (Emphasis added.)
In Matter of Kim v Criminal Ct. of City of N. Y. (77 Misc 2d 740, 741, affd 47 AD2d 715), the Supreme Court at Special Term granted a writ of prohibition barring a second prosecution in the Criminal Court after the Judge, in a nonjury trial, declared a mistrial, for the reason that he "was to be assigned to another court part on the following [day]” and could not conclude the nonjury case before the close of business.[8] The Judge, as in the case in Kim, had attempted to revoke his ruling four days later in order to continue the prosecution against the accused.
The petition is therefore granted. A writ of prohibition will issue to prohibit the Judges of the Family Court from reopening the trial begun against Keno White on July 21, 1975, or re-trying the petitioner on any other complaint based on the same facts.

. The Fifth Amendment of the United States Constitution, in pertinent part, declares: "nor shall any person be subject for the same offense to be twice put in jeopardy of life or limb”.
Section 1 of the Fourteenth Amendment of the United States Constitution, in relevant part, provides: "nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.”
Section 6 of Article I of the New York State Constitution declares: "No person shall be subject to be twice put in jeopardy for the same offense”.

. Subdivision (a) of section 712 of the Family Court Act for the State of New York states that " 'Juvenile delinquent’ means a person over seven and less than sixteen years of age who does any act which, if done by an adult, would constitute a crime.”

. After a "fact-finding hearing”, as provided in section 742 of the Family Court Act, if the respondent is found to have violated a criminal law, the "delinquent” may, after a "dispositional hearing” pursuant to section 743, be imprisoned in a State institution for a term up to three years under section 758 of the act.

. In McKiever, the plurality of the Supreme Court declined to grant a jury trial to a juvenile in a delinquency proceeding, notwithstanding its criminal character, because Family Courts and experts claimed that juveniles would be afforded greater protection and privacy in nonjury trials. The majority said (p 550): "If the jury trial were to be injected into the juvenile court system as a matter of right, it would bring with it into that system the traditional delay, the formality, and the clamor of the adversary system and, possibly, the public trial.” Justices Douglas, Black and Marshall dissented, insisting that all constitutional rights enjoyed by adults in criminal trials are applicable to juveniles in delinquency proceedings. Justice Brennan concurred with the majority, but only on the grounds that the public was not barred from nonjury trials in Pennsylvania where the case originated.

. GPL 40.30 defines prosecution, giving rise to jeopardy, to mean: "1 * * * when the action * * * (b) * * * in the case of a trial by the court without a jury, a witness is sworn.” (Cf. also NY Const, art I, § 6.)

. The doctrine of parens patriae invested the King and later the Chancellor with the role of "father of all children.” In the United States the juvenile court proceeding was conceived as "one in which a fatherly judge touched the heart and conscience of the erring youth by talking over his problems, by paternal advice and admonition, and in which, in extreme situations, benevolent and wise institutions of the State provided guidance and help 'to save him from a downward career.’ ” (Cf. The President’s Commission on Law Enforcement and Administration of Justice, Task Force Report: Juvenile Delinquency and Youth Crime [1967], pp 2-4; Matter of Gault, 387 US 1, 26.)

. Since 1933 the administrative practice of rotating Family Court Judges between Family Parts and Children’s Parts, and from one county of New York City to another, has been regarded by experts as a cause and not a cure for juvenile court problems. In her treatise, A View From the Bench, published in 1964 by the National Council on Crime and Delinquency, Justine Wise Polier, a former Judge of the New York Family Court, said that the rotation system caused delay in the proper disposition of cases. Judge Polier suggested that children’s rights were thereby undermined, and remarked (p 13): "One must question why an action which affects the freedom and life-planning for a child may be passed from one judge to another.”

. See n 5.