968 F.2d 1213
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
UNITED STATES OF AMERICA, Plaintiff-Appellee,
v.
Michael SNIPE, a/k/a Michael Martin, a/k/a John Doe, a/k/a
Mike, Defendant-Appellant.
 No. 91-5179.
 United States Court of Appeals,
Fourth Circuit.
 Submitted: May 21, 1992
Decided: July 8, 1992
 
 Appeal from the United States District Court for the Eastern District of Virginia, at Norfolk. J. Calvitt Clarke, Jr., Senior District Judge. (CR-91-9-N)
 Reuben S. Hill, Jr., Sams & Hill, Norfolk, Virginia, for Appellant.
 Richard Cullen, United States Attorney, Robert J. Seidel, Jr., Assistant United States Attorney, Charles D. Griffith, Jr., Assistant United States Attorney, Norfolk, Virginia, for Appellee.
 E.D.Va.
 AFFIRMED.
 Before MURNAGHAN, SPROUSE, and HAMILTON, Circuit Judges.
 OPINION
 PER CURIAM:
 
 
 1
 Michael Snipe appeals his convictions, after a jury trial, for his involvement as the trigger-man in the murders of Roland S. Harvey and Milton C. Boush, two members of a drug ring believed to be cooperating with law enforcement authorities, in violation of 18 U.S.C. § 371 (1988) (conspiracy to commit violent crimes in aid of racketeering), 18 U.S.C. § 1952(a) (Supp. II 1990) (use of interstate commerce facilities in the commission of a murder-for-hire) and 18 U.S.C. § 1952(b) (Supp. II 1990) (murder-for-hire on behalf of a racketeering enterprise). We affirm the convictions in all respects.
 
 I.Facts
 
 2
 George Harris, who is from New York, operated an extensive and lucrative drug distribution network in Norfolk, Virginia. He used several salaried employees to facilitate the actual sale of cocaine and to provide tight security for himself and the rented location in which he conducted business. Security included armed guards inside and outside the residence, a walkie-talkie communication system to report the presence of law enforcement authorities, and the use of a police scanner to monitor law enforcement activities in the area. The business grew and generated huge sums of cash, money orders, and checks from the sale of cocaine. Johney Freeman, an acquaintance of Harris from New York, oversaw the day-to-day management of the cocaine distribution operations.
 
 
 3
 Roland Harvey occasionally went with Harris to New York to bring back cocaine. He also worked inside distributing the drugs. In 1985, Harvey approached members of the vice and narcotics squad of the Norfolk Police Department to provide them with information regarding Harris's drug network. Based on the information Harvey provided, the police were able to obtain four search warrants to search the situs of Harris's operations, as well as the residences of its most influential members. The searches revealed highly incriminating evidence concerning the drug ring, including weapons, bank records, and cocaine. As a result, state warrants were issued for many members of the network, including Freeman and Fencel Martin, a key player in the Harris group. All but Harris were released on bond.
 
 
 4
 Once released, the group sought to identify the person responsible for the police raids. Suspicions quickly focused on Harvey after members of the network witnessed his leaving the police station while they were being bonded out on state narcotics charges. Freeman and another member of the group, Bonney Russell, located Harvey's residence and, on July 10, 1985, fired two rounds from a pistol into Harvey's second floor apartment. They left the scene with the mistaken belief he had been shot.
 
 
 5
 On July 29, 1985, Harvey publicly testified in a state court preliminary hearing. Based on his testimony, indictments were returned against members of Harris's network. Harris himself was not indicted because he had not been extradited from New York.
 
 
 6
 Authorities relocated Harvey from the Tidewater area to California. In December 1985, he returned to testify in the trial against Martin, who was subsequently convicted. Concerned about the impact of Harvey's testimony on Martin's trial and the prospects for his own impending trial, Freeman visited Harris in jail and discussed the possibility of hiring someone to murder Harvey. Harris agreed to pay $10,000 if Freeman would find a hit man. The money was to be paid through Harris's wife, Crystal Harris.
 
 
 7
 Freeman consulted with Richard Pritter in New York, who recommended Michael Snipe to commit the murder. Freeman was acquainted with Snipe from previous drug activity in New York. When approached by Freeman, Snipe agreed to the deal under the condition that Freeman accompany him to Norfolk. At the time, neither knew the location of Harvey. In January 1986, Harvey returned to the Norfolk area for a visit, unbeknown to law enforcement officials. Through the grapevine, Freeman learned that Harvey was in the area.
 
 
 8
 Freeman and Snipe drove to the home of a member of the group, Gladys Anderson, to obtain a firearm. Freeman told her they had come to "take care of business." Snipe was introduced only as "Mike." The two spent a night at Anderson's home and the next day, she drove them to obtain a gun. Anderson described"Mike" as having a gap between his teeth.
 
 
 9
 Freeman testified at trial that he and Snipe staked out the house where Harvey had been staying and observed him leaving on the night of January 30, 1986. Snipe directed Freeman to wait at a nearby convenience store, at which time Snipe exited the car. A witness, Michael Ussery, testified that while making a delivery for his employer, he heard a loud pop. When he looked in the direction of the noise, he saw a single figure and three or four flashes accompanied by a popping sound. He then saw a lone gunman walking away from the scene.
 
 
 10
 Freeman testified that he heard several shots and then saw Snipe approach the car and get in. Snipe said he had hit Harvey once in the chest at which point Harvey had fallen back into the bushes. The autopsy report later confirmed Harvey had been killed by a gunshot wound to the chest. Freeman and Snipe then returned to Anderson's home and listened to the news. When it was announced that there had been a fatal shooting, the two left the house and went straight back to New York. The $10,000 payment for the murder was eventually collected from Crystal Harris in New York. Freeman gave Snipe $3000.
 
 
 11
 Without Harvey's testimony, the State was unable to pursue further prosecutions of members of the Harris network. One member, Milton C. Boush, was not present at the preliminary hearing in which Harvey had testified. State prosecutors felt there was no chance of using the transcript of that proceeding against Boush, and therefore dropped the charges against him.
 
 
 12
 The members of the network surmised that the charges against Boush were dropped because he was cooperating with authorities. One member, Bonney Russell, told Freeman, who was in prison, in a coded conversation that Boush was providing information to police. Freeman, in turn, conversed with Harris, who was incarcerated in New York. Harris gave his approval for Freeman to arrange for the murder of Boush and promised to pay $10,000. Freeman made the same arrangements with Snipe as he had with the previous murder.
 
 
 13
 Freeman and Snipe returned to Virginia on May 25, 1986, and stayed with Bonney Russell, whom they asked to obtain a firearm. Russell was able to observe "Mike" during this time as did Selwyn Martin, who observed "Mike's" missing teeth.
 
 
 14
 On the night of May 26, Russell and Snipe were waiting in a vehicle for Boush to emerge from his parents' home in Norfolk. Snipe asked Russell whether the man they saw was Boush. When he received an affirmative response from Russell, Snipe left the car, walked up to Boush and fired six shots, which instantly killed Boush. Russell had left the scene and met Snipe at one of three previously arranged meeting points. The two proceeded to drive to Newport News, where Russell rented a motel room for Snipe. During their drive, Snipe told Russell that he (Snipe) was the one who had killed Harvey and that his money would be paid by Crystal Harris.
 
 
 15
 Snipe contacted Freeman upon his return to New York. Freeman arranged to pick up the balance of the $10,000 owed for the murder and paid Snipe his share.
 
 II.Pretrial Order
 
 16
 Prior to the trial, the Government filed a motion for an evidentiary ruling to order Snipe to "remove all artificial dental work capable of being removed, including but not limited to dental plates, and display his remaining natural teeth to the jury." Alternatively, the Government requested an order for Snipe to undergo a pretrial dental examination. The court held a hearing on the matter and granted the Government's primary motion requiring the removal of dental work. The ruling specified that the Government would first need to show relevancy and the jury would be dismissed while Snipe actually removed the dental appliances. Snipe challenges this ruling, arguing that the district court's order violated his Fourth, Fifth, and Sixth Amendment rights. We do not believe the district court's ruling was improper, nor did it impermissibly taint Snipe's right to a fair trial.
 
 
 17
 Two witnesses claimed to have observed Snipe and stated he had missing front teeth. Gladys Anderson made such an observation when Snipe was in Virginia in January 1986, allegedly to commit the murder of Harvey. Martin made such an observation when Snipe was in Virginia in May 1986, allegedly to murder Boush.
 
 
 18
 Snipe's argument that the district court's order violated his Fifth Amendment privilege against self-incrimination is without merit. It is well-settled that the Fifth Amendment "protects an accused only from being compelled to testify against himself, or otherwise provide the State with evidence of a testimonial or communicative nature." Schmerber v. California, 384 U.S. 757, 761 (1966) (footnote omitted). The privilege does not attach to "evidence of acts noncommunicative in nature." Id. at 761 n.5 . The Supreme Court has stated that,
 
 
 19
 the prohibition of compelling a man in a criminal court to be witness against himself is a prohibition of the use of physical or moral compulsion to extort communications from him, not an exclusion of his body as evidence when it may be material. The objection in principle would forbid a jury to look at a prisoner and compare his features with a photograph in proof.
 
 
 20
 Holt v. United States, 218 U.S. 245, 252-53 (1910). See also United States v. Maceo, 873 F.2d 1 (1st Cir.), cert. denied, 493 U.S. 840 (1989) (upholding marshal's examination of a criminal defendant's teeth and gums while in defendant's cell to validate the detective's description of the defendant's teeth).
 
 
 21
 This case is analogous to other situations where courts have upheld orders requiring nontestimonial cooperation. See, e.g., Gilbert v. California, 388 U.S. 263 (1967) (no Fifth Amendment violation in court's order requiring handwriting exemplars); United States v. Wade, 388 U.S. 218 (1967) (no error in ordering defendant to appear in line-up and speak); Schmerber v. California, 384 U.S. at 757 (upholding court's order of blood sample); Holt v. United States, 218 U.S. 245 (1910) (no error in court ordering defendant to put on a certain piece of clothing); United States v. Valenzuela, 722 F.2d 1431, 1433 (9th Cir. 1983) (requiring a defendant to shave his facial hair); United States v. Lamb, 575 F.2d 1310 (10th Cir.) (upholding court's ordering defendant to shave), cert. denied, 439 U.S. 854 (1978); United States v. Roberts, 481 F.2d 892 (5th Cir. 1973) (defendant ordered to put on stocking mask); United States v. Hammond, 419 F.2d 166 (4th Cir. 1969) (defendant ordered to wear a false goatee), cert. denied, 397 U.S. 1068 (1970); United States v. Holland, 378 F. Supp. 144, 154-55 (E.D. Pa.) (dental examination of defendant not violative of Fifth Amendment rights), aff'd, 506 F.2d 1050 (3d Cir. 1974), cert. denied, 420 U.S. 994 (1975).
 
 
 22
 Snipe also argues that the district court's order violated his Sixth Amendment right to a fair and impartial trial because it deprived him of his dignity and self-respect before the jury, and therefore prejudiced his case. Unlike cases where defendants were required to wear shackles or prison garb, Snipe's removal of his dental wear outside the presence of the jury did not create a "continuing influence" which could "affect a juror's judgment" regarding his guilt or innocence. Estelle v. Williams, 425 U.S. 501, 505 (1976) (no constitutional right to appear in civilian clothes; but may not be compelled to wear identifiable prison clothes).
 
 
 23
 Snipe's Fourth Amendment claim is directed solely to the propriety of the dental examination alternatively requested by the Government. This examination never occurred because the district court permitted Snipe to remove his dental work and display his teeth to the jury rather than undergo the examination which would have required him to submit to X-rays and dental imprints. Because the dental examination never occurred, its propriety under the Fourth Amendment is irrelevant to this appeal.
 
 
 24
 For these reasons, we find no error in the district court's ruling.
 
 III.Sufficiency of the Evidence
 
 25
 In reviewing the conviction, we must determine whether, "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979) (emphasis in original); United States v. Fisher, 912 F.2d 728, 730 (4th Cir. 1990), cert. denied, 59 U.S.L.W. 3769 (U.S. 1991).
 
 
 26
 Snipe points to inconsistencies in the testimony of Martin, Russell, Anderson, and Freeman. He also states that they were motivated to lie because they were trying to avoid additional prison terms. Credibility determinations are within the sole province of the jury and are not subject to review. United States v. Saunders, 886 F.2d 56 (4th Cir. 1989). Moreover, the evidence against Snipe was overwhelming and was sufficient to convince a rational trier of fact that Snipe was guilty beyond a reasonable doubt.
 
 IV.Conclusion
 
 27
 For the reasons expressed, we affirm the conviction in all respects. We dispense with oral argument because the facts and legal contentions are adequately presented in the materials before the Court and argument would not aid the decisional process.
 
 AFFIRMED