**Ann K. STEHNEY, Plaintiff,**

**v.**

**William J. PERRY et al., Defendants.**

**Civ. No. 94–6306 (GEB).**

United States District Court,
D. New Jersey.

Nov. 6, 1995.

Frank Askin, Constitutional Litigation Clinic, Rutgers Law School, Newark, NJ, for Ann K. Stehney.

Peter Robbins, U.S. Department of Justice, Washington, DC, for William J. Perry, J. Michael McConnell, Lee Hanna, and Jeanne Zimmer.

Gerard H. Hanson, Hill Wallack, Princeton, NJ, for The Institute for Defense Analyses, Center for Communications Research, David M. Goldschmidt.

## MEMORANDUM OPINION

BROWN, District Judge.

This matter comes before the Court on the motion of federal defendants, William J. Perry, Secretary of Defense, J. Michael McConnell, Director, National Security Agency/Central Security Service ("NSA"), Lee Hanna, Chief of Management Services for NSA, Jeanne Zimmer, current Chief of Management Services for NSA, to dismiss plaintiff's complaint pursuant to FED.R.CIV.P. 12(b)(1) & (6), and on the motion of nonfederal defendants, The Institute for Defense Analysis, Center for Communications Research ("IDA/CCR"), and David M. Goldschmidt, Director of IDA/CCR, for summary judgment pursuant to FED.R.CIV.P. 56. For the reasons set forth in this Memorandum Opinion, this Court will grant federal defendants' motion to dismiss Counts I through V of the Complaint. Further, this Court will deny nonfederal defendants' motion for summary judgment pursuant to FED.R.CIV.P. 56 and, instead, will dismiss Count VI of the Complaint pursuant to 28 U.S.C. § 1367.

## I. BACKGROUND

### A. The Polygraph Policy

NSA is an agency within the Department of Defense ("D.O.D.") charged with protecting and gathering sensitive information relating to national security. *See* 50 U.S.C.A.

§ 402. IDA/CCR, a nonprofit "think tank" located in Princeton, New Jersey, assists NSA by performing extremely sensitive research in cryptology—the making and breaking of codes and other secure communications. Compl. ¶ 4. To conduct this research, IDA/CCR employees must have access to top-secret classified information, "the unauthorized disclosure of which reasonably could be expected to cause exceptionally grave damage to the national security." Executive Order ("E.O.") 12356, § 1.1(a)(1); 3 C.F.R. 174 (1983). Because this material is "particularly sensitive information" pertaining to intelligence activities and "intelligence sources or methods," it is restricted to a "special access program," E.O. 12356, § 4.2, known as "Sensitive Compartmented Information" ("SCI").

Access to SCI may be granted only after "a determination of trustworthiness has been made by agency heads or designated officials." *Id.* § 4.1(a). This judgment is intended to be "an overall common sense determination," *see* Director of Central Intelligence Directive No. 1/14 ("DCID No. 1/14") Annex A at 9 (Jan. 22, 1992), annexed to Declaration of Paul W. Naper ("Naper Dec.") as Exh. A1, made after a "thorough" background investigation "designed to develop information as to whether the individual clearly meets the SCI personnel standards." *Id.* ¶ 7.a. at 3. The background investigation includes "records checks and personal interviews of various sources by trained investigative personnel," *id.* ¶ 7.b. at 3, in the aid of which the subject is required to furnish fingerprints, and a personal-history statement delving into the subject's personal life. *Id.* ¶ 7.c. at 3. The subject is also required to sign releases, "as necessary," of "police, credit, financial, education, and medical records," and may be required to provide photographs of herself. *Id.* In all cases, at least one interview of the subject is required, and "[a]n additional personal interview will be conducted when necessary to resolve any significant adverse information and/or inconsistencies developed during the investigation." *Id.* ¶ 8.d. at 4.

Reinvestigations to determine continued eligibility for access to classified information must be conducted at least once every 5 years. *Id.* ¶ 10.a. at 5. To facilitate the reinvestigation, the subject must furnish an updated personal history statement and sign appropriate releases. *Id.* ¶ 10.b. at 5–6. "In all cases," the reinvestigation requires a "personal interview" addressing such matters as foreign assignments, connections and associations; approaches by foreign intelligence agencies; unreported breaches of security procedures; drug use; and criminal activities. *Id.*

Since 1953, NSA has conducted all security-clearance interviews of agency employees with the aid of a polygraph. Department of Defense, *The Accuracy and Utility of Polygraph Testing* 11, annexed to Naper Dec. at Exh. A12. When IDA/CCR was created in 1959, however, D.O.D. allowed an exception for professional employees. *See* Memorandum of Louis J. Bonanni, Deputy Director for Administration at 1 (Dec. 11, 1980), annexed to Naper Dec. as Exh. A6. Nonprofessional employees, including administrators, clerical workers and security personnel, were required to undergo polygraphs. *Id.*

D.O.D. reversed this policy in 1982, however, and authorized the use of polygraph interviews on an aperiodic basis, and in connection with security-clearance reinvestigations, for all personnel with access to SCI, including all contract employees. *Periodic Reinvestigation Procedures for Individuals Cleared for Access to Sensitive Compartmented Information (SCI)*, Att. 1 at 1–2 to Memorandum of Frank Carlucci (Aug. 6, 1982), annexed to Naper Dec. as Exh. A7. One month later, NSA issued a directive that all "[c]ivilian, military and contractor personnel cleared for access to NSA SCI shall be requested to take polygraph examinations on an aperiodic basis at any time after their initial clearance," Memorandum of Lincoln D. Faurer at 1 (Sept. 27, 1982), annexed to Naper Dec. as Exh. A8, and IDA/CCR was instructed to inform its employees that the policy would go into effect on March 7, 1983. Letter of Philip T. Pease at 1 (Feb. 4, 1983), annexed to Naper Dec. as Exh. A9. The first use of the polygraph interview for pro-

fessional personnel began on August 5, 1983. Memorandum of Louis J. Bonanni at 1 (Aug. 5, 1983), annexed to Naper Dec. as Exh. A10.

*B. The Polygraph*

The polygraph measures changes in blood pressure, pulse, respiration, muscular activity and electrodermal activity (perspiration on fingertips) in reaction to the questions asked during the interview. *See* JOHN E. REID & FRED E. INBAU, TRUTH AND DECEPTION 4 (1966). These patterns are simultaneously recorded on pen registers while the subject wears a pressure cuff on her arm, a light tube across her chest and abdomen, and painless electrodes on two fingertips. *Id.* at 4–5. The changes provide subtle indications of "stress or anxiety," *Anderson v. Philadelphia*, 845 F.2d 1216, 1218 (3d Cir.1988), that might not otherwise be apparent to the interviewer. The theory of lie detection can be summarized as follows: the act of lying leads to conscious conflict; conflict induces fear or anxiety, which in turn results in clearly measurable physiological change. M.J. SAKS & R. HASTIE, SOCIAL PSYCHOLOGY IN COURT 192 (1978).

Polygraph examinations are intended to be "supplementary to, not ... a substitute for, other forms of investigation." D.O.D. Directive No. 5210.48, ¶ 6 at 2, annexed to Naper Dec. as Exh. A4; D.O.D. Reg. No. 5210.48–R, Ch. 1, ¶ A.5 at 1–1, annexed to Naper Dec. as Exh. A5. The results of the polygraph chart are "used during the security interview as an investigative tool with which to gather leads, encourage relevant disclosures, and identify areas of questioning that may need further development." *See* D.O.D. Reg. 5210, ¶ 9 at 3. Therefore, whether favorable or unfavorable, "[a]ny final administrative determinations rendered in cases in which a polygraph examination is taken shall not be based on the results of an analysis of the polygraph charts," NSA/CSS Reg. No. 122–3 § III, ¶ 6.a at 4, annexed to Naper Dec. as Exh. A3, but on information gathered independently.

Two types of polygraph interviews are used by the NSA in the background screening process. For an initial clearance, a "full-scope" interview is conducted with respect to the following areas:

(1) verification of the person being interviewed;

(2) counterintelligence questions; and

(3) clarifications or elaborations of information provided on completed security forms or other information pertaining to the person's eligibility for a clearance.

*Id.* § IV, ¶ 7.a(1)(a)-(c). For aperiodic and reinvestigation examinations, a shorter "counterintelligence ("CI")—scope" interview is used. *Id.* § III, ¶ 7.b(1). This interview focuses narrowly on

(1) espionage or sabotage activities against the United States;

(2) deliberate damage to any government information system;

(3) deliberate disclosure of classified information to unauthorized persons; and

(4) undisclosed contacts with foreign nationals or representatives.

Memorandum of David H. Schachnovsky at 1 (May 26, 1992), annexed to Naper Dec. as Exh. A11.

Access to SCI "must be clearly consistent with the national security." NSA/CSS Reg. No. 122–06, ¶ 4 at 2, annexed to Naper Dec. as Exh. A2, and "[a]ny doubt concerning a person's continued eligibility will be resolved in favor of the national security." *Id.* ¶ 5 at 3. Because non-cooperation by the subject is an intolerable impediment to completion of the background investigation, "[f]ailure to provide required security forms, releases, and other data," or "refusing to undergo the required security processing or medical or psychological testing will normally result in a denial, suspension, or revocation of access [to SCI]." DCID No. 1/14 Annex A at 14. Specifically, "[p]ersons who refuse to take a polygraph examination in connection with determining their continued eligibility for access to specifically designated information in special access programs ... may be denied access," D.O.D. Reg. No. 5210.48–R, Ch. 1, ¶ A.5 at 1–1, regardless of any other informa-

tion developed during the background investigation process.

### C. The Plaintiff

In 1982, plaintiff Dr. Ann K. Stehney was a tenured mathematics professor at Wellesley College. Compl. ¶ 11. Stehney accepted a part-time consulting position with IDA/CCR in the summer of 1982. Before beginning her work for IDA/CCR, however, NSA conducted a security investigation into Stehney's background. At the time of plaintiff's background check, the polygraph requirement for IDA professional personnel was not in effect. Stehney received access to SCI on June 8, 1982, and soon accepted a permanent, full-time position with IDA/CCR.

In or around 1989, Stehney was advised that she was the subject of a routine background reinvestigation for continued access to SCI. Compl. ¶ 19. Stehney was asked to submit to a polygraph and was informed that the polygraph examination was in connection with her 1989 reinvestigation. Compl. ¶ 20. In August 1992, and at all subsequent times, Stehney conscientiously refused to submit to a polygraph examination in connection with her continued access to SCI. *Id.* Instead, Stehney asked that she be treated as if she had taken the polygraph examination and failed. *Id.*

In or around May 1993, Stehney was informed that NSA had decided to deny her continued access to SCI because she refused to submit to a polygraph examination. Compl. ¶ 21. In June 1993, plaintiff appealed the proposed revocation of her SCI access to the Director of NSA's Office of Security. Compl. ¶ 23. Stehney filed a second appeal to defendant Hanna, Chief of Management Services in September 1993, and made her final appeal to defendant Vice Admiral McConnell in January 1994, thereby exhausting all available administrative remedies. Compl. ¶¶ 22–23. Stehney's SCI clearance was terminated on January 15, 1994, and her employment by IDA/CCR was terminated shortly thereafter. Compl. ¶¶ 1, 14.

Eleven months after her clearance was terminated, plaintiff filed suit in this court.

Plaintiff's complaint sets forth six counts for relief. First, plaintiff argues that she is entitled to mandamus relief to force NSA officials to carry out certain duties alleged to be owed to her by regulation. Compl. ¶ 52. In the second count of the Complaint, plaintiff maintains that "the procedures used to deprive [her] of her access to SCI and to deny her appeals thereof ·... deprived [her] of a property interest without due process of law." Compl. ¶¶ 58–65. The third count of the Complaint alleges that defendants' requirement that plaintiff submit to a polygraph examination was in contravention of the Fourth Amendment of the United States Constitution. Compl. ¶¶ 66–73. In Count IV, plaintiff avers that defendants' limited exemption from the polygraph examination lacked any rational basis and was granted solely to male employees in violation of the United States Constitution's guarantee of equal protection under the law. Compl. ¶ 74. Plaintiff alleges in Count V that defendants' polygraph requirement violates New Jersey law and public policy. Compl. ¶¶ 85–86. Finally, in Count VI, plaintiff maintains that defendants violated New Jersey employment discrimination law by failing to assist plaintiff in her attempt to secure an exemption in the same manner defendants assisted male employees. Compl. ¶¶ 89–91.

## II. DISCUSSION

### A. STANDARD FOR A MOTION TO DISMISS

■ A district court may grant a motion to dismiss for lack of subject matter jurisdiction pursuant to FED.R.CIV.P. 12(b)(1) based on the legal insufficiency of a claim. Dismissal pursuant to FED.R.CIV.P. 12(b)(1) is only proper, however, when the claim " 'clearly appears to be immaterial and made solely for the purpose of obtaining jurisdiction or ... is wholly insubstantial and frivolous.' " *Kehr Packages, Inc. v. Fidelcor, Inc.,* 926 F.2d 1406, 1408–09 (3d Cir.), *cert. denied,* 501 U.S. 1222, 111 S.Ct. 2839, 115 L.Ed.2d 1007 (1991) (quoting *Bell v. Hood,* 327 U.S. 678, 683, 66 S.Ct. 773, 776, 90 L.Ed. 939 (1946)). On a FED.R.CIV.P. 12(b)(1) motion, plaintiff bears the burden of persuading

the Court that subject matter jurisdiction exists. *Id.* at 1409. The factual allegations of plaintiff's complaint must be accepted as true. *Mortensen v. First Federal S & L Ass'n,* 549 F.2d 884, 891 (3d Cir.1977).

 Federal defendants also move to dismiss certain claims in plaintiff's Complaint pursuant to FED.R.CIV.P. 12(b)(6). Such a motion may be granted only if, accepting all well pleaded allegations in the complaint as true, and viewing them in the light most favorable to plaintiff, plaintiff is not entitled to relief. *Bartholomew v. Fischl,* 782 F.2d 1148, 1152 (3d Cir.1986); *Angelastro v. Prudential–Bache Securities, Inc.,* 764 F.2d 939, 944 (3d Cir.), *cert. denied,* 474 U.S. 935, 106 S.Ct. 267, 88 L.Ed.2d 274 (1985). The Court may not dismiss a complaint unless plaintiff can prove no set of facts which would entitle him to relief. *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957); *Angelastro,* 764 F.2d at 944. "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974). In setting forth a valid claim, a party is required only to plead "a short plain statement of the claim showing that the pleader is entitled to relief." FED.R.CIV.P. 8(a).

## B. COUNT I: MANDAMUS

In Count I of her complaint, plaintiff alleges that defendants failed to process and decide the proposed revocation of her SCI access or appeal thereof in accordance with applicable D.O.D. regulations. Compl. ¶ 56. Plaintiff argues that "[t]his failure included, but is not limited to, the failure to treat Ms. Stehney as if she had taken the polygraph examination and failed, and the failure to make a finding as to whether Ms. Stehney met the qualifications for SCI access stated in DCID 1/14, sec. 5." *Id.* Plaintiff maintains that as a result of this failure, she lost her job with IDA/CCR. In her prayer for relief, plaintiff asks this Court to issue a writ of mandamus ordering (1) defendants Hanna and/or Zimmer to evaluate her appeal in accordance with applicable regulations, including but not limited to Annex B of DCID 1/14; and (2) defendants Hanna, Zimmer, Perry, and McConnell to ensure that the proposed revocation of plaintiff's access to SCI and any appeals are decided in accordance with applicable regulations, including but not limited to Annex B of DCID 1/14 and DCID 1/14, sec. 5.[1] Compl. ¶¶ 20–21.

In response to plaintiff's request for relief, defendants argue: (1) plaintiff lacks standing to bring her claim because she is no longer employed by IDA/CCR and, thus, she no longer has a need for classified information that may only be released on a "need to know basis"; (2) plaintiff is asking this Court to become embroiled in a nonjusticiable political question; and (3) the type of relief plaintiff seeks, *i.e.,* a writ of mandamus, cannot be granted by this Court because the federal government has not unequivocally waived its sovereign immunity. Each of these three arguments will be addressed seriatim.

### 1. Standing

 To establish standing to sue, plaintiff must demonstrate that (1) she has suffered some actual or threatened injury, (2) her injury is "fairly traceable" to the defendants' allegedly unlawful conduct, and (3) her injury is likely to be redressed by the requested relief. *Allen v. Wright,* 468 U.S. 737, 752, 104 S.Ct. 3315, 3325, 82 L.Ed.2d 556 (1984). In the present case, plaintiff does not allege that the injunctive relief she seeks, *i.e.,* an order that restores her security clearance, or at least instructs NSA to conduct new administrative proceedings, can be lawfully granted without an ongoing "need to know" classified information. E.O. 12356, § 4.1(a), 3 C.F.R. 174 (1983). Moreover,

---

1. In her opposition to Defendants' Motions to Dismiss for Failure to State a Claim ("Plaintiff's Brief") plaintiff abandons her *Bivens*-style claims, *id.* at 45, and recasts her pendent, state-law claim as one alleging wrongful termination of some new kind of federal employment. *Id.* at 14–20. She therefore no longer asserts any conceivable claim against federal defendants in their individual capacities.

plaintiff does not deny that her need for access to SCI ceased when she lost her job at IDA/CCR, nor does she contend that her former employer would be under any legal obligation to rehire her if her clearance were restored. In the absence of such an obligation, plaintiff's claim to standing is premised on nothing more than legally insufficient "someday" speculations about what a third-party might do in hypothetical future circumstances. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 564, 112 S.Ct. 2130, 2138, 119 L.Ed.2d 351 (1992); *see also Greene v. United States*, 376 U.S. 149, 150, 84 S.Ct. 615, 617, 11 L.Ed.2d 576 (1964) (finding that an injunctive claim for access to classified information was moot after the employment-related need for access ceased). Therefore, until plaintiff establishes, presumably in state court, her right to reinstatement by IDA/CCR, she lacks standing to seek restoration of her security clearance in federal court. Accordingly, defendants' motion to dismiss Count I pursuant to FED.R.CIV.P. 12(b)(1) will be granted.

### 2. Political Question

 Even if plaintiff has standing to bring this action, her claim is nonjusticiable because it requires the Court to become embroiled in a political question. The Supreme Court has held that certain types of issues, regardless of their merits, are reserved by the Constitution exclusively to the political process. Among other things, such questions exist where there is "a textually demonstrable constitutional commitment of the issue to the coordinate political department." *Baker v. Carr*, 369 U.S. 186, 217, 82 S.Ct. 691, 710, 7 L.Ed.2d 663 (1962). Under this test, it has long been the "generally accepted view ... that foreign policy [is] the province of and responsibility of the Executive," and outside the purview of the courts. *Haig v. Agee*, 453 U.S. 280, 293–94, 101 S.Ct. 2766, 2775, 69 L.Ed.2d 640 (1981); *see also Cafeteria & Restaurant Workers Union v. McElroy*, 367 U.S. 886, 890, 81 S.Ct. 1743, 1746, 6 L.Ed.2d 1230 (1961) (recognizing that the

executive branch "has traditionally exercised unfettered control" of access to military bases); *Chicago & Southern Air Lines v. Waterman S.S. Corp.*, 333 U.S. 103, 111, 68 S.Ct. 431, 436, 92 L.Ed. 568 (1948) ("[T]he very nature of executive decisions as to foreign policy is political, not judicial" because "[t]hey are decisions of a kind for which the Judiciary has neither aptitude, facilities nor responsibility and which has long been held to belong in the domain of political power not subject to judicial intrusion or inquiry").

 The same principle logically applies to the protection of national-security secrets used in aid of foreign and military policy. *Dorfmont v. Brown*, 913 F.2d 1399, 1404–05 (9th Cir.1990) (Kozinski, J., concurring), *cert. denied*, 499 U.S. 905, 111 S.Ct. 1104, 113 L.Ed.2d 214 (1991); *see also New York Times v. United States*, 403 U.S. 713, 728–29, 91 S.Ct. 2140, 2148–49, 29 L.Ed.2d 822 (1971) (Stewart, J., concurring) ("The responsibility [for protecting classified information] must be where the power is. If the Constitution gives the Executive a large degree of unshared power in the conduct of foreign affairs and the maintenance of our national defense, then under the Constitution the Executive must have the largely unshared duty to determine and preserve the degree of internal security necessary to exercise that power successfully."). This conclusion is based on the fact that the text of the Constitution expressly confers on the President exclusive authority to take action as "Commander in Chief of the Army and Navy of the United States." U.S. CONST., ART. II, § 2. The authority to

> classify and control access to information bearing on national security and to determine whether an individual is sufficiently trustworthy to occupy a position ... that will give that person access to such information flows primarily from this constitutional investment of power and exists quite apart from any explicit congressional grant.

\* \* \* \* \* \*

For reasons 'too obvious to call for enlarged discussion,' the protection of classified information must be committed to the

broad discretion of the agency responsible, and this must include broad discretion to determine who may have access to it. Certainly, it is not reasonably possible for an outside nonexpert body to review the substance of such a judgment.... Nor can such a body determine what constitutes an acceptable margin of error in assessing the potential risk....

\* \* \* \* \* \*

Thus, unless Congress specifically has provided otherwise, courts have traditionally been reluctant to intrude upon the authority of the Executive in military and national security affairs.

*Dep't of the Navy v. Egan*, 484 U.S. 518, 526–30, 108 S.Ct. 818, 824–25, 98 L.Ed.2d 918 (1988) (quoting *CIA v. Sims*, 471 U.S. 159, 105 S.Ct. 1881, 85 L.Ed.2d 173 (1985)). Because of this "textually demonstrable constitutional commitment" of power to the Executive, *Baker*, 369 U.S. at 217, 82 S.Ct. at 710,

there is a reasonable basis for the view that an agency head who must bear the responsibility for the protection of classified information committed to his custody should have. the final say in deciding whether to repose his trust in an employee who has access to such information.

*Egan*, 484 U.S. at 529, 108 S.Ct. at 825 (quoting *Cole v. Young*, 351 U.S. 536, 546, 76 S.Ct. 861, 868, 100 L.Ed. 1396 (1956)). For the judiciary to attempt to review the President's final say in matters of access to national security secrets would therefore violate "fundamental principles of separation of powers." *Dorfmont*, 913 F.2d at 1404 (Kozinski, J., concurring); *see also Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 170–71, 2 L.Ed. 60 (1803) ("Where the head of a department acts in a case, in which executive discretion is to be exercised; in which he is the mere organ of executive will; it is again repeated, that any application to a court to control, in any respect, his conduct would be rejected without hesitation.").

A federal court would violate these fundamental principles of separation of powers if it were to review the merits of security clearance decisions. In *Egan*, the Supreme Court held that the Merit System Appeals Board did not have the statutory authority to re-view the substantive decisions of the Navy to revoke the plaintiff's security clearance. 484 U.S. at 526–29, 108 S.Ct. at 823–25. In its subsequent decision in *Webster v. Doe*, 486 U.S. 592, 108 S.Ct. 2047, 100 L.Ed.2d 632 (1988), the Supreme Court confirmed that federal courts lack jurisdiction to review the merits of security clearance. *See also Dorfmont*, 913 F.2d at 1401 (reasoning that the Supreme Court's reasoning on the reviewability of security clearance decisions "applie[d] no less to the federal courts than to [administrative review boards].").

In the present matter, plaintiff argues that the political question doctrine is inapplicable because she is not asking this Court to review the merits of NSA's decision to revoke her access to SCI. Instead, plaintiff asserts that she is asking this Court to review whether or not NSA followed its own internal guidelines when deciding to revoke plaintiff's security clearance. Stehney charges that NSA never reached the merits of her security review because it refused to find that plaintiff's refusal to submit to a polygraph examination. was equivalent to taking and failing a polygraph examination. This refusal, according to plaintiff, led the NSA to revoke her access to SCI before making any merit findings pursuant to paragraphs 5, 12 and Annex B of DCID 1/14.

Paragraphs 5, 12 and Annex B of DCID 1/14 provide, in pertinent part:

**5. Personnel Security Standards**

Criteria for security approval of an individual on a need-to-know basis for access to SCI follow:

a. The individual must be stable; trustworthy; reliable; of excellent character, judgment, and discretion; and of unquestioned loyalty to the United States.

b. The individual requiring access to SCI must be a U.S. citizen.

c. The individual's immediate family must also be U.S. citizens....

d. Members of the individual's immediate family and any other persons to whom he or she is bound by affection or obligation should neither be subject to physical, mental, or other forms of duress by a foreign

power or by persons who may be or have been engaged in criminal activity, nor advocate the use of force or violence to overthrow the Government of the United States or the alteration of the form of Government of the United States by unconstitutional means.

**12. Determination of Access Eligibility**

The evaluation of the information developed by investigation of an individual's loyalty and suitability will be accomplished under the cognizance of the SOIC concerned by analysts of broad knowledge, good judgment, and wide experience in personnel security and/or counterintelligence. When all other information developed on an individual is favorable, a minor investigation requirement that has not been met should not preclude favorable adjudication. In all evaluations, the protection of the national interest is paramount. Any doubt concerning personnel having access to SCI should be resolved in favor of the national security, and the access should be denied or revoked. The ultimate determination of whether the granting of access is clearly consistent with the interest of national security will be an overall common sense determination based on all available information.

**Annex B: Appeals**

Any individual who has been considered for initial or continued access to SCI pursuant to the provisions of DCID 1/14 shall, to the extent provided below, be afforded an opportunity to appeal the denial or revocation of such access.

DCID 1/14 ¶¶ 5, 12, and Annex B.

In essence, plaintiff argues that because NSA's guidelines provide that access to SCI should not be revoked solely for failing a polygraph examination, it necessarily follows that NSA cannot revoke plaintiff's access to SCI based on her refusal to submit to a polygraph examination. *See* Compl. ¶ 20. Plaintiff's premise that she is similarly situated to a person who took the polygraph examination and failed, however, is nothing more than a thinly disguised effort to review the merits of the NSA's revocation action. Plaintiff asks this Court to substitute NSA's criteria for granting top-secret security

clearances with her own self-serving criteria. This is precisely the type of second-guessing that is prohibited by the political question doctrine.

Moreover, this Court finds that NSA did, in fact, render a decision on the merits in this case. The relevant regulations and policy memoranda not only authorize revocation of a security clearance based solely on a failure to cooperate with the polygraph interview, D.O.D. Reg. No. 5210.48–R, Ch. 1, ¶ A.5 at 1–1; NSA/CSS Reg. No. 122–06, ¶ 6 at 3, they expressly envision that revocation "normally" will be the appropriate result of such a refusal. DCID No. 1/14 Annex at 14. Therefore, there was no need for the NSA to consider paragraphs 5, 12 and Annex B of DCID 1/14 once plaintiff refused to submit to a polygraph examination. Accordingly, plaintiff's claim involves a nonjusticiable political question and federal defendants' motion to dismiss this count pursuant to FED.R.CIV.P. 12(b)(1) is granted.

█ Finally, there is no merit to plaintiff's contention that, because she had an alleged "constitutionally protected interest in the procedures to evaluate her eligibility for continued access to SCI, and in the appeal procedures," Plaintiff's Brief at 6, this Court must look beyond the political question doctrine and compel NSA to evaluate plaintiff according to paragraphs 5, 12 and Annex B of DCID 1/14. If the Constitution gives the President the "final say" over who may be allowed access to classified information, *Egan*, 484 U.S. at 529, 108 S.Ct. at 825, then such plenary authority cannot, by definition, be exercised unconstitutionally. *See also Hill v. Dep't of Air Force*, 844 F.2d 1407, 1409 (10th Cir.) (authority of Egan may not be bypassed by invoking alleged constitutional rights), *cert. denied*, 488 U.S. 825, 109 S.Ct. 73, 102 L.Ed.2d 49 (1988); *Williams v. Reilly*, 743 F.Supp. 168, 171 (S.D.N.Y.1990) ("This threshold jurisdictional determination is not affected by the fact that the challenge is made on the grounds of a constitutional deprivation.").

Furthermore, plaintiff's reliance on *Greene v. McElroy*, 360 U.S. 474, 79 S.Ct. 1400, 3 L.Ed.2d 1377 (1959); *Vitarelli v. Seaton*, 359

U.S. 535, 79 S.Ct. 968, 3 L.Ed.2d 1012 (1959); and *Service v. Dulles,* 354 U.S. 363, 77 S.Ct. 1152, 1 L.Ed.2d 1403 (1957) is misplaced and does not persuade this Court that judicial intrusion into security-clearance decisions is warranted because she raised alleged constitutional concerns. These decisions did not address any jurisdictional or constitutional issue, let alone the political question doctrine as it applies to the revocation of a security clearance. In *Vitarelli* and *Service,* career government employees challenged their terminations under the old Civil Service Act. *Vitarelli,* 359 U.S. at 536–46, 79 S.Ct. at 971–76; *Service,* 354 U.S. at 373, 77 S.Ct. at 1157–58. The plaintiffs in those cases did not challenge the denial of security clearances, nor could they have done so. *See Egan,* 484 U.S. at 531, 108 S.Ct. at 826. Moreover, although in *Greene* the Supreme Court reviewed whether an agency had been delegated the authority to deny a contractor employee's security clearance without providing an opportunity to respond, no justiciability issue was raised or addressed. 360 U.S. at 493, 79 S.Ct. at 1411–12. Finally, the Supreme Court's decision in *Webster,* 486 U.S. at 601–02, 108 S.Ct. at 2052–53, to allow a "colorable" constitutional challenge to the termination of CIA employment to proceed on the merits is not to the contrary. In *Webster,* the Court merely concluded that review of constitutional challenges to employee termination decisions of the Director of Central Intelligence was not precluded under 5 U.S.C. § 701(a)(2), because such matters were not committed by Congress to agency discretion by law by the language of 50 U.S.C. § 403(c). The holding was strictly "a matter of statutory construction, not constitutional interpretation." *Dorfmont,* 913 F.2d at 1405 (Kozinski, J., concurring).

 Even if the political question doctrine did not preclude review of constitutional concerns, plaintiff has no such constitutional right to protect in this case. It is well settled that there is no constitutional interest in a security clearance. *Egan,* 484 U.S. at 529, 108 S.Ct. at 824–25. Nor is there such an interest in the procedural rules under which clearance determinations are made and appealed administratively. *Hill,* 844 F.2d at 1411–12. Therefore, plaintiff cannot demonstrate that NSA's actions contravened her alleged due process rights because she has no such rights. Accordingly, federal defendants' motion to dismiss Count I of the Complaint is granted.

### 3. *Sovereign Immunity*

 Assuming that this Court had constitutional authority to entertain any of plaintiff's claims, her request for a "writ of mandamus"[2] to force the NSA to correct certain purported errors in its handling of her security-clearance revocation is barred by the doctrine of sovereign immunity. The doctrine of sovereign immunity provides that the United States cannot be sued unless it gives its consent, and this consent defines a court's jurisdiction to hear a particular case. *United States v. Sherwood,* 312 U.S. 584, 586, 61 S.Ct. 767, 769, 85 L.Ed. 1058 (1941). In *United States v. Testan,* 424 U.S. 392, 96 S.Ct. 948, 47 L.Ed.2d 114 (1976), the Supreme Court confirmed this principle when it declared that "except as Congress has consented to a cause of action against the United States, 'there is no jurisdiction ... to entertain suits against the United States.'" *Id.* at 399, 96 S.Ct. at 954 (quoting *Sherwood,* 312 U.S. at 587–88, 61 S.Ct. at 770–71). "Absent consent to sue, dismissal of the action is required." *Hutchinson v. United States,* 677 F.2d 1322, 1327 (9th Cir.1982) (citations omitted). Moreover, the Constitution itself does not contain a waiver of sovereign immunity. *Arnsberg v. United States,* 757 F.2d 971, 980 (9th Cir.1984), *cert. denied,* 475 U.S. 1010, 106 S.Ct. 1183, 89 L.Ed.2d 300 (1986). "Such [a] waiver [of sovereign immunity] cannot be implied, but must be unequivocally expressed." *FDIC v. Meyer,* —— U.S. ——, ——, 114 S.Ct. 996, 1000, 127 L.Ed.2d 308 (1994). Finally, a suit for injunctive relief to force NSA officials to carry out certain duties alleged to be owed to plaintiff by regulation is "[a] suit against federal officers in their official capacity" and therefore "a suit

---

**2.** The writ of mandamus has been abolished. Fed.R.Civ.P. 81(b). This Court will assume that, instead, plaintiff is seeking an injunction in the nature of mandamus. *See* Charles Alan Wright & Arthur R. Miller, 12 Federal Practice and Procedure § 3134, at 202–03 (1973).

against the United States." *Biase v. Kaplan*, 852 F.Supp. 268, 284 n. 14 (D.N.J.1994) (citing *Kentucky v. Graham*, 473 U.S. 159, 166, 105 S.Ct. 3099, 3105, 87 L.Ed.2d 114 (1985)).

Plaintiff fails to identify any statute in which the United States is purported to have unequivocally consented to be sued for failure to follow Defense Department or NSA security-clearance regulations. The only statute on which plaintiff relies, the Mandamus Act, 28 U.S.C. § 1361, is a jurisdictional provision, which, standing alone, creates no "cause of action," *Mattern v. Weinberger*, 519 F.2d 150, 156 (3d Cir.1975), *vacated on other grounds*, 425 U.S. 987, 96 S.Ct. 2196, 48 L.Ed.2d 812 (1976), let alone a cause of action expressly waiving sovereign immunity. *Pit River Home & Agricultural Co-op Ass'n v. United States*, 30 F.3d 1088, 1098 (9th Cir.1994). Furthermore, plaintiff cannot rely on the waiver of sovereign immunity in the Administrative Procedure Act, 5 U.S.C. §§ 701–706, because judicial review of NSA security-clearance decisions is expressly precluded under 50 U.S.C. § 685, *see* 5 U.S.C. § 701(a)(1), and committed to agency discretion by law. *Egan*, 484 U.S. at 530, 108 S.Ct. at 825–26.

■■■ Even if a putative cause of action and waiver of sovereign immunity were present, however, the Mandamus Act provides only that "[t]he district courts shall have original jurisdiction of any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff." 28 U.S.C. § 1361. This language creates potential subject-matter jurisdiction in only two circumstances. The first is where a government official is required to perform "a clear, ministerial and nondiscretionary duty," *Mattern*, 519 F.2d at 156, that is "preemptory and unmistakable." *ICC v. New York, New Havan & Hartford Railroad*, 287 U.S. 178, 191, 53 S.Ct. 106, 109, 77 L.Ed. 248 (1932), "certain," *id.* at 194, 53 S.Ct. at 110, "inflexible," *id.* at 199, 53 S.Ct. at 111–12, "clear beyond debate," *id.* at 204, 53 S.Ct. at 113–14, "positively commanded and so plainly prescribed as to be free from doubt." *Mattern*, 519 F.2d at 156 (quotation omitted).

The second is where the plaintiff seeks to compel an official to undertake a neglected action that requires the exercise of discretion to carry out. In this second context, mandamus relief is available only to "compel [the] action" itself, "but not to direct the exercise of discretion in a particular way nor to direct the retraction or reversal of action already taken." *ICC v. Humbolt S.S. Co.*, 224 U.S. 474, 484, 32 S.Ct. 556, 559, 56 L.Ed. 849 (1912).

■■■ The Supreme Court has held that "it should be obvious that no one has a 'right' to a security clearance," *Egan*, 484 U.S. at 528, 108 S.Ct. at 824, and that revocation of a clearance is a "discretionary" action. *Id.* at 630, 108 S.Ct. at 825–26. What plaintiff seeks here is merely an order reversing NSA's decision to revoke her clearance and directing NSA to exercise its discretion in a different way to reach a different outcome. Because plaintiff is not seeking the performance of a non-discretionary, ministerial duty withheld, her claim does not fall within the scope of the Mandamus Act. Therefore, Count I of plaintiff's Complaint is dismissed.

## C. COUNT II: DUE PROCESS CLAIM

In Count II of her complaint, plaintiff alleges defendants denied her due process by failing to (1) allow her to confront witnesses against her; (2) provide her with the information collected during her 1989 re-investigation; and (3) give her the opportunity to present live testimony at a hearing. Compl. ¶ 60. Plaintiff further alleges that she had a property interest in her continued access to SCI; her job at IDA/CCR; the procedures involved in reinvestigating her background, proposing the revocation of her access to SCI, and evaluating any appeals regarding her access to SCI; and the remedies available to her after the decision was made to revoke her access to SCI. Compl. ¶¶ 61–62. Moreover, plaintiff contends that she has a liberty interest in being able to practice her chosen profession. Compl. ¶ 63.

■■■ "The requirements of procedural due process apply only to the deprivation of interests" in life, "liberty and property." *Board of Regents v. Roth*, 408 U.S. 564, 571,

92 S.Ct. 2701, 2706, 33 L.Ed.2d 548 (1972). According to the Supreme Court, "it should be obvious that no one has a 'right' to a security clearance." *Egan,* 484 U.S. at 528, 108 S.Ct. at 824. Thus, there is no property interest in a security clearance, *Hodge v. Jones,* 31 F.3d 157, 165 (4th Cir.), *cert. denied,* —— U.S. ——, 115 S.Ct. 581, 130 L.Ed.2d 496 (1994); *Greenwood v. FAA,* 28 F.3d 971, 976 (9th Cir.1994), or in a job that requires a security clearance, *Mangino v. Dep't of Army,* 1994 WL 55606, *2 (10th Cir.), *cert. denied,* —— U.S. ——, 115 S.Ct. 275, 130 L.Ed.2d 193 (1994); *Dorfmont,* 913 F.2d at 1403, or in the procedural rules under which clearance determinations are made and appealed administratively, *Hill,* 844 F.2d at 1411–12, that is protected by due process.

 Nor does plaintiff have a liberty interest in a security clearance. To have a liberty interest, plaintiff must show that (1) the government changed her employment status; (2) the change occurred as a result of derogatory allegations that created a stigma on the plaintiff; (3) the derogatory allegations were publicized by the government; and (4) this stigmatizing publication significantly reduced her ability to pursue her chosen profession. *Siegert v. Gilley,* 500 U.S. 226, 233–34, 111 S.Ct. 1789, 1793–94, 114 L.Ed.2d 277 (1991). The denial of a security clearance "does not equate with passing judgment upon an individual's character" and "in no way implies disloyalty or any other repugnant characteristic." *Egan,* 484 U.S. at 528–29, 108 S.Ct. at 824–25 (citation omitted). Therefore, courts have universally held that denial of a clearance does not stigmatize the person in any way that implicates a liberty interest. *See, e.g., Hodge,* 31 F.3d at 165; *Mangino,* 1994 WL 55606 at *2; *NFFE v. Greenberg,* 983 F.2d 286, 289 (D.C.Cir.1993).

 Moreover, even if a property or liberty interest protected by due process were present here, plaintiff does not identify any additional procedures that would have improved the fairness of the decision-making process. "[D]ue process is flexible and calls for such procedural protections as the particular situation demands," *Morrissey v. Brewer,* 408 U.S. 471, 481, 92 S.Ct. 2593, 2600, 33 L.Ed.2d 484 (1972), to afford a meaningful opportunity to be heard at a meaningful time. *Mathews v. Eldridge,* 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18 (1976). Contrary to plaintiff's assertions to the contrary, *see* Compl. ¶ 60, "[t]he Fifth Amendment does not require a trial-type hearing in every conceivable case of government impairment of a private interest." *Cafeteria Workers,* 367 U.S. at 894, 81 S.Ct. at 1748. Where the interest involved is "a mere privilege subject to the Executive's plenary power, it has traditionally been held that notice and hearing are not constitutionally required." *Id.* at 895, 81 S.Ct. at 1748; *see also Hill,* 844 F.2d at 1410 ("[An Agency's internal] procedures [relating to revocation of an existing security clearance] are not the type of rules or understandings that secure certain benefits and that support claims of entitlement to those benefits. The procedures are administrative devices which are intended to promote fairness and safeguard the rights of individual employees, but are not intended thereby to diminish Executive authority rooted in Executive responsibility.").

 In this case, prior to the revocation of her clearance, plaintiff was afforded both notice and an opportunity to present detailed arguments and supporting documents. This procedure is more than sufficient to satisfy due process. *Doe v. Cheney,* 885 F.2d 898, 910 (D.C.Cir.1989). Furthermore, inasmuch as the only relevant fact—plaintiff's refusal to cooperate with the polygraph interview—was uncontested, it is impossible to see what point would have been served by allowing her "to confront witnesses against her" or be "provided with the information collected during her 1989 reinvestigation." Compl. ¶ 60. The purpose of allowing cross-examination and discovery in an administrative hearing is to provide "an opportunity to show that [relevant information] is untrue" in situations where "the evidence consists of the testimony of individuals whose memory might be faulty or who, in fact, might be perjurers or persons motivated by malice, vindictiveness, intolerance, prejudice, or jealousy." *Greene,* 360 U.S. at 496, 79 S.Ct. at 1413. Where the facts are not in dispute, due process no more requires an evidentiary hearing in the administrative

context than it does in the judicial context. Accordingly, this Court finds that Count II of plaintiff's complaint has no merit, and defendants' motion to dismiss this claim pursuant to FED.R.CIV.P. 12(b)(6) is granted.

### D. COUNT III: FOURTH AMENDMENT CLAIM

■ Plaintiff next claims that the polygraph interview is a search that violates the Fourth Amendment when it is not based on probable cause. Compl. ¶¶ 72–73. Specifically, plaintiff argues that the polygraph examination closely resembles the search of a person's private papers and diaries. Plaintiff's Brief at 37. Plaintiff suggests that "[i]t is difficult for such an examination to be limited because it concerns the most private and cherished of our possessions—personal thoughts and ideas." *Id.* at 38–39. Plaintiff adds that "[b]ecause polygraph examinations constitute searches within the meaning of the Fourth Amendment, they should presumably take place only after the issuance of a warrant based upon probable cause." *Id.* at 40. Finally, plaintiff contends that "the government interest is no longer as compelling as it once was.... With altered security needs engendered by the close of the Cold War, there is no longer any credible justification for abridging Fourth Amendment safeguards of Americans. The national security needs envisioned by the courts during the Cold War are no longer relevant to the current state of world affairs." *Id.* at 43.

■ The Fourth Amendment of the United States Constitution provides for the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. CONST., Amend. 4. The essential purpose of the proscriptions in the Fourth Amendment is to "impose a standard of 'reasonableness' upon the exercise of discretion by government officials...." *Delaware v. Prouse,* 440 U.S. 648, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979). Thus, the Fourth Amendment protects individuals from "unreasonable government intrusions into their legitimate expectations of privacy." *United States v. Chadwick,* 433 U.S. 1, 7, 97 S.Ct. 2476, 2481, 53 L.Ed.2d 538 (1977). As the Supreme Court has noted:

[Reasonableness] is not capable of precise definition or mechanical application. In each case it requires a balancing of the need for the particular search against the invasion of personal rights that the search entails. Courts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted.

*Bell v. Wolfish,* 441 U.S. 520, 559, 99 S.Ct. 1861, 1884, 60 L.Ed.2d 447 (1979).

No person with access to classified information, however, can have a reasonable expectation that she may refuse to give "an accounting of [her] use or abuse of the public trust," *Uniformed Sanitation Men Ass'n v. Commissioner of Sanitation of City of New York,* 392 U.S. 280, 284, 88 S.Ct. 1917, 1919, 20 L.Ed.2d 1089 (1968), or fail "to answer relevant questions about [her] official duties." *Gardner v. Broderick,* 392 U.S. 273, 278, 88 S.Ct. 1913, 1916, 20 L.Ed.2d 1082 (1968). Nor can plaintiff have a reasonable expectation that this inquiry will be conducted "on her own informational terms," *Wyman v. James,* 400 U.S. 309, 321–22, 91 S.Ct. 381, 388, 27 L.Ed.2d 408 (1971), so as to minimize the ability of the questioner to gather possibly adverse information from the surroundings.

■ Moreover, a polygraph does not constitute a search within the meaning of the Fourth Amendment. While "penetrat[ion] beneath the skin," *Skinner,* 489 U.S. at 616, 109 S.Ct. at 1412–13, to extract inorganic material, *Winston v. Lee,* 470 U.S. 753, 760, 105 S.Ct. 1611, 1616, 84 L.Ed.2d 662 (1985) (bullet), bodily fluid, *Skinner,* 489 U.S. at 616–17, 109 S.Ct. at 1412–13 (urine); *Schmerber v. California,* 384 U.S. 757, 769, 86 S.Ct. 1826, 1835, 16 L.Ed.2d 908 (1966) (blood), or "deep lung" breath, *Skinner,* 489 U.S. at 616, 109 S.Ct. at 1412–13, has been held to be a search within the meaning of the Fourth Amendment, the Supreme Court also has held that involuntary production of recorded voice samples is not a search because there is no reasonable expectation of privacy in the "physical characteristics of a person's voice, its tone and manner" or in "his facial

characteristics" during speech. *United States v. Dionisio,* 410 U.S. 1, 14, 93 S.Ct. 764, 771–72, 35 L.Ed.2d 67 (1973). The same is true of handwriting samples. *United States v. Mara,* 410 U.S. 19, 20–22, 93 S.Ct. 774, 775–76, 35 L.Ed.2d 99 (1973). Similarly, the taking of a fingerprint is not a search, *Dionisio,* 410 U.S. at 15, 93 S.Ct. at 772, even though it involves touching and pressing, and reveals physiological traits too minute to be considered exposed to public view in any meaningful sense. *Id.* Further, a dental examination to see if a tooth is missing is not a search, even though it involved an intrusion into a body cavity to identify a disfiguring physical feature that most people would tend to conceal. *United States v. Holland,* 378 F.Supp. 144, 154 (E.D.Pa.), *aff'd,* 506 F.2d 1053 (3d Cir.1974), *cert. denied,* 420 U.S. 994, 95 S.Ct. 1433, 43 L.Ed.2d 676 (1975). The incidental contact involved in attaching polygraph equipment and the rather innocuous readings of heart rate, respiration and perspiration changes are hardly more intrusive than a dental examination. *See United States v. Haynes,* 24 C.M.R. 881 (AFBR 1957) ("If there is anything hidden in the mind of the person subjected to such an examination, the machine does not produce it, though it appears to be evident that the examination and the results thereof are not infrequently cogent factors which lead the subject to reveal his secrets.").

Furthermore, with respect to physical and psychological stress, "[q]uestions, however unfriendly," simply "do not constitute an unreasonable search" as a matter of law. *Goerlich v. Davis,* 1991 WL 195772, at *4 (N.D.Ill.1991). A polygraph, like a voice exemplar, cannot plausibly be viewed as "an annoying, frightening, and perhaps humiliating experience," *Dionisio,* 410 U.S. at 14, 93 S.Ct. at 771–772 (citation omitted), and certainly cannot be compared to a pat-down search while spread-eagled against a wall by a police officer in public. *Terry v. Ohio,* 392 U.S. 1, 24–25, 88 S.Ct. 1868, 1881–82, 20 L.Ed.2d 889 (1968). Refusal to take a polygraph, therefore, does not give rise to a cause of action under the Fourth Amendment. *Chesna v. Dep't of Defense,* 850 F.Supp. 110, 116–17 (D.Conn.1994).

Even assuming that a polygraph is deemed to be a search within the meaning of the Fourth Amendment, a polygraph used for the purpose of a national security background reinvestigation is hardly unreasonable. It is a "longstanding principle that neither a warrant or probable cause, nor, indeed, any measure of individualized suspicion, is an indispensable component of reasonableness in every circumstance." *NTEU v. Von Raab,* 489 U.S. 656, 665, 109 S.Ct. 1384, 1390–91, 103 L.Ed.2d 685 (1989). "[W]here a Fourth Amendment intrusion serves special needs, beyond the normal need for law enforcement, it is necessary to balance the individual's privacy expectations against the Government's interests to determine whether it is impractical to require a warrant or some level of individualized suspicion in the particular context." *Id.* at 665–66, 109 S.Ct. at 1390–91. In this case, the compelling interest in protecting national security outweighs whatever minor intrusion may be occasioned by a polygraph interview. It is "obvious and unarguable" that there is no government interest as great as the security of the country. *Haig,* 453 U.S. at 293–94, 101 S.Ct. at 2774–75. Moreover, there can be no question that polygraphing is rationally related to the "compelling interest in national security." *Chesna,* 850 F.Supp. at 118. Accordingly, defendant's motion to dismiss Count III of plaintiff's complaint pursuant to FED.R.CIV.P. 12(b)(6) is granted.

### E. COUNT IV: EQUAL PROTECTION CLAIM

In Count IV of her complaint, plaintiff argues that a limited exception from the polygraph requirement for "world class mathematicians" violates the equal protection component found to exist in the Fifth Amendment. *See Bolling v. Sharpe,* 347 U.S. 497, 499–500, 74 S.Ct. 693, 694–95, 98 L.Ed. 884 (1954). Under the relevant regulations, "[i]n extremely rare instances," agency heads "may approve one-time, limited access to SCI" for a period not to exceed 90 days, when such access "is deemed necessary to accomplish unique mission requirements." DCID No. 1/14, ¶ 9.b. at 5. Pursuant to this authority, NSA permits "[a] very limited number of consultants to IDA who are certi-

fied by senior Agency officials as being World Class Mathematicians ... [to] be exempted from the polygraph requirement." NSA Memorandum Serial M5–151–91E ("NSA Mem.") at 1 (Aug. 2, 1991), annexed as Exh. A35 to Naper Dec. Plaintiff claims that this policy irrationally discriminates against less capable mathematicians, and has an indirect, discriminatory effect on women. Compl. ¶¶ 76–77.

■ Since there is no fundamental right to a security clearance, *Chesna,* 850 F.Supp. at 118, a classification distinguishing world-class mathematicians from their less distinguished peers "must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis" for it. *FCC v. Beach Communications,* 508 U.S. 307, ——, 113 S.Ct. 2096, 2101, 124 L.Ed.2d 211 (1993). Under this standard, "a statute or regulation should not be overturned on equal protection grounds 'unless the varying treatment of different groups or persons is so unrelated to the achievement of any combination of legitimate purposes that we can only conclude that the [government's] actions were irrational.'" *Anderson,* 845 F.2d at 1223 (quoting *Vance v. Bradley,* 440 U.S. 93, 97, 99 S.Ct. 939, 942–43, 59 L.Ed.2d 171 (1979)).

The purpose of the "world-class mathematician" exemption is to allow "a very limited number of individuals," who are recognized "as being among the highest echelon of internationally renowned mathematicians" and whose unique abilities are needed on a short-term consulting basis, to be "exempted from the NSA polygraph requirement to facilitate their recruitment." NSA Mem.Att. 2 at 1. In light of the recognized potential for "lost talent when suitable individuals refuse to participate in a polygraph examination," *see* Redefining Security, A Report to the Secretary of Defense and the Director of Central Intelligence, Joint Security Commission at 65 (Feb. 28, 1994), annexed as Exh. A13 to Naper Dec., it is hardly irrational to think that there may be rare and singular circumstances where the unique talents of an especially gifted cryptologist expert may be so important to the protection of national security—and needed so desperately and immedi-

ately—that the interest in procuring his or her services outweighs the increase in security risks occasioned by foregoing a polygraph on a one-time basis. Clearly, such an exemption "can arguably be said to result in a better-qualified group" of applicants for particularly important positions, *Anderson,* 845 F.2d at 1223, and therefore is consistent with equal protection.

■ Finally, plaintiff's claim that the "world-class mathematician" policy has an indirect discriminatory effect on women is also unpersuasive. It is well settled that a facially-neutral classification does not violate equal protection merely because "it may affect a greater proportion of one [group] than of another." *Washington v. Davis,* 426 U.S. 229, 242, 96 S.Ct. 2040, 2049, 48 L.Ed.2d 597 (1976). To state an equal protection claim, plaintiff must allege that the classification was selected "'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Personnel Admin. of Mass. v. Feeney,* 442 U.S. 256, 279, 99 S.Ct. 2282, 2296, 60 L.Ed.2d 870 (1979); *see Chesna,* 850 F.Supp. at 117–18 (dismissing equal-protection challenge to security-clearance polygraph testing based on alleged disparate impact on blacks). In the present case, no such allegation appears in plaintiff's complaint. Accordingly, this count of the Complaint will also be dismissed.

### F. STATE POLYGRAPH CLAIM

■ In Count V of her Complaint, plaintiff brings a pendant state law claim against defendants, alleging that the polygraph requirement she was asked to submit to violated N.J.S.A. 2C:40A–1. Compl. ¶¶ 84–86. State regulation in the area of national security is expressly preempted by Article I, § 8 and Article II, § 2 of the Constitution. *Pennsylvania v. Nelson,* 350 U.S. 497, 504–05, 76 S.Ct. 477, 481–82, 100 L.Ed. 640 (1956). Likewise, there can be no state regulation of a President's constitutionally granted powers to "classify and control access to information bearing on national security and to determine whether an individual is sufficiently trustworthy to occupy a position ... that will give that person access

to such information." *Egan,* 484 U.S. at 527, 108 S.Ct. at 824.

Moreover, state interference with national-security polygraphing is also preempted by federal statute. Although the Employee Polygraph Protection Act of 1988, 29 U.S.C. §§ 2001–2009, generally prohibits employers engaged in interstate commerce from requiring lie-detector tests, 29 U.S.C. § 2002(1), it expressly exempts "the administration, by the Federal government, in the performance of any intelligence or counterintelligence function, of any lie detector test to . . . any employee of [an NSA] contractor," 29 U.S.C. § 2006(b)(2)(A)(iii), or "any individual assigned to a space where sensitive cryptographic information produced, processed, or stored for" NSA. 29 U.S.C. § 2006(b)(2)(A)(v). The Act further provides that it "shall not preempt any provision of any State or local law or of any negotiated collective bargaining agreement that prohibits lie detector tests or is more restrictive with respect to lie detector tests," "[e]xcept as provided in" 29 U.S.C. § 2006(a)-(c). 29 U.S.C. § 2009. Thus, both the Constitution and federal law expressly preempt states from prohibiting the use of polygraphs as part of a security-clearance background investigation. Therefore, this Court will grant federal defendants' motion to dismiss this count pursuant to Fed.R.Civ.P. 12(b)(6).

### G. State Law Discrimination Claim

■ Finally, in Count VI of her complaint, plaintiff alleges that nonfederal defendants Goldschmidt and IDA/CCR did not assist her in securing an exemption or waiver of the polygraph examination, and that this failure to assist was because plaintiff is a female. Since this Court has granted defendants' motion to dismiss on the federal counts (Counts I through V), only the state law claim remains. Under the 1990 enactment of the supplemental jurisdiction statute, 28 U.S.C. § 1367, a federal district court may decline to exercise its supplemental jurisdiction over state law claims if all federal claims are dismissed. 28 U.S.C. § 1367(c)(3); *Growth Horizons, Inc. v. Delaware County, Pa.,* 983 F.2d 1277, 1285 n. 14 (3d Cir.1993). In exercising its discretion, the district court

should take into account principles of judicial economy, convenience, and fairness to the litigants. *Id.* at 1984 (citing *United Mine Workers v. Gibbs,* 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966)). As one legal scholar has observed:

> Whether a dismissal of the touchstone claim should bring about a dismissal . . . of the dependent claim for want of supplemental jurisdiction should hinge on the moment within the litigation when the dismissal of the touchstone claim takes place and on the other surrounding circumstances. . . . [I]f the dismissal of the main claim occurs late in the action, after there has indeed been substantial expenditure in time, effort and money in preparing the dependent claims, knocking them down with a belated rejection of supplemental jurisdiction may not be fair. Nor is it by any means necessary.

David D. Siegel, Practice Commentary, appended to 28 U.S.C.A. § 1367 (cited in *Growth Horizons,* 983 F.2d at 1284).

■ In this case, the Court has dismissed every claim over which it had original subject matter jurisdiction, and sees no reason to exercise supplemental jurisdiction over a claim arising under state law. This case is at an early stage of litigation, and there is no concern that dismissal at this juncture would be unfair. Moreover, plaintiff's state law claim for discrimination has little, if anything, in common with her federal claims. Accordingly, Count VI of the Complaint shall be dismissed pursuant to 28 U.S.C. § 1367.

### III. CONCLUSION

For the reasons set forth in this Memorandum Opinion, this Court will grant federal defendants' motion to dismiss Counts I through V. Further, this Court will deny nonfederal defendants' motion for summary judgment and, instead, will dismiss Count VI of the Complaint pursuant to 28 U.S.C. § 1367.